**STATE of Maine**

**v.**

**Walter RINES.**

Supreme Judicial Court of Maine.

Aug. 5, 1970.

**10**

---

Peter T. Dawson, Peter W. Culley, Asst. Attys. Gen., Augusta, for plaintiff.

Gaston M. Dumais, Lewiston, for defendant.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE and POMEROY, JJ.

MARDEN, Justice.

On report under the provisions of Rule 37A M.R.Crim.Proc., and Rule 72(d) M.R. C.P., based upon the following Agreed Statement of Facts and Issues.

"On February 8, 1970, at approximately 4:00 P.M., Walter M. Rines was arrested by Maine State Police Trooper Parris McIver on Route # 202 in the Town of Monmouth, County of Kennebec, State of Maine, for a violation of 29 M.R.S.A. § 1312, to wit: operating a motor vehicle while impaired by the use of intoxicating liquor. Based on the within agreed statement of facts, the Defendant has objected to the admissibility of the blood test. It is agreed that in the event the Law Court shall determine that the blood test is admissible, the Defendant will plead guilty to the pending charge, and in the event the Law Court shall determine that the blood test is inadmissible, the State will dismiss the charge with prejudice. The within statement of facts constitute the exclusive foundation with respect to the questioned admissibility of the blood test.

In connection with the arrest, Trooper McIver rendered an "implied consent warning" in accordance with the form attached hereto, marked Exhibit # 1, and incorporated by reference herein. The respondent by verbal response and signature indicated a desire to have a blood test taken at the direction of Trooper McIver. He also indicated a desire not to have a blood or urine test conducted by a physician of his own choosing. (See Exhibit # 1) Pursuant to Mr. Rines' "implied consent", Trooper McIver transported the respondent to the Augusta General Hospital, where at 5:30 P.M. on February 8, 1970, O. T. Feagin, M.D., drew a sample of the respondents' blood.

Trooper McIver provided Dr. Feagin with a B-D (Becton-Dickinson Alcohol Kit) for use in the drawing of the blood sample. Trooper McIver removed a sealed styrofoam box from a cardboard container, bearing Control No. A0003. Dr. Feagin broke one seal, opened the kit and noted that affixed to the inner lid of the styrofoam box was a "Manufacturer's Certificate and Description of Kit Contents" which read as follows:

"Certificate of Manufacturer: This is to certify that the VACUTAINER tubes, stoppers, and contents, VACUTAINER holder, VACUTAINER needle and swab are new and have not been previously used. No alcohol is used in the manufacturing procedures for these items or in the sterilization of the VACUTAINER needle.

"Contents of the Kit:

2  32ooXF357  10ml  VACUTAINER Tubes, each containing 20mg sodium fluoride and 10mg EDTA (Na$_2$) disodiumethylenediaminetetraacetate

1  3200H VACUTAINER Holder, disposable

1  5749 VACUTAINER Multiple Sample Needle, sterile and disposable

1 Swab containing Benzalkonium Chloride Solution—Concentration 1:750 Aqueous

4 Pressure-sensitive Seals (self-destructing type)

1 Direction Sheet including Consent Form and blood collection Certificates

1 Direction Sheet on use of VACU-TAINER System"

Dr. Feagin checked the contents of the kit, removed the four seals provided therein, an instruction manual for the VACU-TAINER System, and an instruction manual for the police officer. The contents also revealed two VACUTAINER tubes, one VACUTAINER holder, one swab and one needle. Each of the VACUTAINER tubes contained a granular white substance which Dr. Feagin recognized to be consistent in color and texture with the anti-coagulant indicated on the Manufacturer's Certificate as sodium fluoride and EDTA ($Na_2$). Using the contents of the kit, Dr. Feagin drew the blood sample in question from the respondent in the presence of Trooper McIver. Dr. Feagin then placed one seal over the end of the VACUTAINER tube containing the blood sample and noted thereon his initials, the date, the name of the arresting officer, and the name of the respondent. Trooper McIver took the same styrofoam box and placed the blood sample therein, sealing the same with two of the seals previously described. At that time, Dr. Feagin signed a Police Officer's Report contained on the exterior label of the styrofoam box and initialed the seals at either end of the box. Trooper McIver then placed his initials, the date, the time and the name of the respondent upon the seals at either end of the styrofoam box and penned in information within the area designated Police Officer's Report. (See Exhibit #2, which is incorporated by reference herein and which represents the same styrofoam box used in the instant case exclusive of the original contents and resulting blood sample.)

Trooper McIver left the respondent at the Kennebec County Jail and then proceeded to the Main State Police Headquarters in Augusta where he placed the styrofoam box containing the respondents' blood sample in a locked refrigerator-depository at which time he entered the information as to the time and date of arrest, the time and date of the drawing of the blood sample, the time and date of placing the blood sample in the refrigerator, and the name of the Defendant in a log book maintained adjacent to the locked refrigerator-depository.

At 8:00 A.M., February 9, 1970, Mr. Lawrence Roy, Chemist, Maine State Pulbic (sic) Health Laboratory, unlocked the refrigerator-depository and picked up the same styrofoam box at the State Police Headquarters in Augusta. Upon his return to the Laboratory in Augusta, Mr. Roy opened the sealed styrofoam box, examined the blood sample, and noted that there was no coagulation. Mr. Roy, being a duly qualified chemist, conducted a test and analysis of the blood sample pursuant to the modified Dubowski method for the purpose of determining the alcohol concentration therein. Mr. Roy rendered his report in duplicate to Trooper McIver on February 10, 1970, and on February 13, 1970, Trooper McIver delivered a copy of said report in hand to the respondent, Mr. Rines.

On December 12, 1969, the State Public Health Laboratory received 2000 Becton-Dickinson Blood Alcohol Kits, bearing control No. A0003. (An original kit from this same lot also bearing Control No. A0003 is included by reference herein and marked Exhibit #3.) Upon receipt of the kits, twenty kits were selected for a random sample and subjected to certain tests and analyses by State Chemists Robert Ericson, Lawrence Roy and Michael Sodano with the following finds:

1. Each kit was completely sealed.

2. The nature of the box and type of seal used makes it impossible to re-

move the seal without destroying the seal.

3. The styrofoam of which the box is made is so easily marked that the cement on the seal of the tape will not release from it without tearing the surface of the box or destroying the seal itself.

4. Each kit contained a manufacturer's certificate as to its contents.

5. The VACUTAINER tubes contained the amount of Sodium Fluoride and EDTA (Na$_2$) disodiumethylenediaminetetraacetate indicated by the Becton-Dickinson Manufacturer's Certificate. The other contents of the kit conformed in every respect with the Manufacturer's Certificate.

6. The VACUTAINER tubes were not usable after testing because the anticoagulants and the vacuum were destroyed in the process of conducting the test.

7. So long as the blood-alcohol kits are kept sealed up to the time of sampling of the blood, there can be no reasonable doubt but that the contents of the kit, lot bearing Control No. A003, would conform in every respect to the Manufacturer's Certificate and description of contents.

It is also stipulated and agreed that no specific testing or analysis has been conducted by anyone on the contents of the particular blood alcohol kit utilized in drawing the blood sample in the instant case.

On the basis of the foregoing foundation, the State would then offer the testimony of the Chemist, Mr. Lawrence Roy, who would testify that in his opinion and on the basis of the tests conducted in accordance with the modified Dubowski method the alcohol concentration in the blood sample was 0.16 percent by weight (grams per 100ml.). The Defendant's objection to the admissibility of the blood test raises the following issues:

1. Does the interior label on the blood alcohol kit, which describes the contents of the kit, and the manufacturer's certificate constitute prima facie evidence or competent evidence to raise a jury question as to the nature and quality of the contents of the blood alcohol kit?

2. Is the random sampling admissible evidence with respect to the nature and quality of the contents of the blood alcohol kit used in the instant blood sample?

3. Is the random sampling a necessary or essential element of the foundation for the admissibility of the blood alcohol test?

4. Does the evidence, as a matter of law, constitute sufficient foundation for the admissibility of the results of the blood alcohol test?"

Both parties upon briefs and argument addressed themselves to the applicability of the hearsay rule of evidence.

The Becton-Dickinson Blood Alcohol Kit (B-D Kit) is not a device which purports to determine the amount of blood alcohol in a given sample by chemical and electronic means, such as the Harger Drunkometer developed in 1938, and subsequently developed similar devices (Intoximeter, Alcometer, and Breathalyzer) discussed in "Chemical Tests and the Law" (1966) by Robert L. Donigan. It is a kit in which is assembled items, listed on the certificate of the manufacturer recited above, designed solely to take from the subject and preserve samples of blood for later analysis to determine the amount of blood alcohol present. The kit contains two glass tubes (Vacutainers) under vacuum and each sealed with a rubber stopper the top and integral part of which is a diaphragm which is pierced by the posterior end of the hollow needle only when the anterior end of the needle has punctured the subject's vein, whereupon the vacuum in the tube draws the blood sample into it. In the tube into

which the blood sample is drawn is white powder purporting to be sodium fluoride and disodiumethylenediaminetetraacetate [EDTA (Na₂), Disodium edetate] referred to in the Manufacturer's Certificate and in the test findings by the State Laboratory. Any pre-use test of the contents of these tubes expends the tubes. In addition to the tubes is a plastic holder into which the tube fits for the purpose of manual control of the needle and tube, a needle factory-sealed in a cellophane envelope, what purports to be a swab sealed in what appears to be aluminum foil and seals by which the tubes containing the samples and the styrofoam box containing the tubes are sealed pending analysis.

### Issue One

■ The first issue raises directly the consideration of the hearsay rule of evidence. This fundamental rule "as accepted in our law, signifies *a rule rejecting assertions, offered testimonially which have not been in some way subjected to the test of Cross-examination*," which embodies two elements, "Cross examination proper and confrontation, but the former is the essential and indispensable feature, the latter only subordinate and dispensable." Wigmore on Evidence, 3rd Ed. § 1362. See Heald v. Thing, 45 Me. 392, 395. The law is equally familiar with the various exceptions to the hearsay rule where, by virtue of necessity and circumstantial probability of trustworthiness, some assertions are nevertheless accepted in evidence as proof of the facts asserted. Wigmore, *supra,* § 1420, et seq. In the established exceptions to the hearsay rule, both elements of cross-examination, stated above, have been recognized as dispensable.

The question is whether the assertions of fact appearing in the Manufacturer's Certificate attached to the interior of the box containing the kit may be accepted as evidence of the facts asserted *vis a vis* the calling of witnesses who have personal knowledge of the facts asserted and available for cross-examination. This is to be resolved by a determination of whether, prompted by necessity and upon the surrounding facts, the certificate has sufficient trustworthiness to permit a presumption of its truth and accuracy, which will permit it to constitute prima facie evidence of the facts asserted.

Necessity: Wigmore, supra, § 1420, speaks of the "necessity" principle as being applicable "(w)here the test of cross-examination is *impossible of application*" or, § 1421, where "(t)he person whose assertion is offered may now be * * * *otherwise unavailable.*" When a consumer asks his druggist "D" for 5 grams of Sodium Fluoride, "D," in delivering to him a bottle so labeled, is asserting that the content of the bottle is Sodium Fluoride. If "D" were offered as a witness for cross-examination, he would be expected to testify that he ordered 500 grams of the drug from X Chemical Company foreign to Maine,—and upon delivery X Company is asserting that the package contains Sodium Fluoride. If a representative "R" of X Company could be offered for cross-examination as a witness under our "out of State Witness" Act (15 M.R.S.A. § 1411 et seq.), the production of such a witness being by no means certain, "R" might be able to testify that he shipped to "D" 500 grams of Sodium Fluoride from a bulk container labeled Sodium Fluoride at his plant,—and in so testifying he is asserting that those engaged in his plant in formulating the product, by depositing the work product in the labeled bin, asserted to him that the end result of their efforts was Sodium Fluoride. Eventually in the chain of production might be found a chemist who, upon cross-examination, could testify that he took certain portions of a powder asserted to him to be soda ash and portions of a liquid asserted to him to be hydrofluoric acid and by combining the two obtained a chemical reaction resulting in a powder having the appearance of sodium fluoride. See Webster's Third New International Dictionary. At this point the tracing of the soda ash and the

hydrofluoric acid begins. The problem is enlarged in any attempt to test by cross-examination the identity of the EDTA ($Na_2$), composed of not less than four chemical products. From all practical considerations the test of cross-examination is impossible to apply even though potential witnesses in the chain of production and distribution technically might be available. In fact, some or all of the potential witnesses in the chain of production might well prove to be actually unavailable. Realities justify the application of the "necessity" principle to the assertions under consideration.

Trustworthiness: With the passage of time we have accepted what a weighing device, or a thermometer, or an x-ray photograph, or the computations in the Maine Farmer's Almanac, or standard mortality tables tell us. As soon as experience concluded that such information was reliable it was accepted as an exception to the hearsay rule.

When the Legislature has been satisfied of the trustworthiness of a scientific process, e. g. blood grouping tests in disputed paternity, 19 M.R.S.A. § 262, and electronic speed measuring devices, such as radar, 29 M.R.S.A. § 1254, it has made the results of such scientific observation admissible in evidence. To the contrary, the results of a polygraph test have not yet been accepted in Maine by either legislature or court. State v. Mottram, 158 Me. 325, 329, 184 A. 2d 225.

■ It is a matter of judicial notice that the consumer public daily accepts as true and relies upon the assertions in labels and brands appearing on packages displayed at the supermarket. This was true even before the Fair Packaging and Labeling Act of November 1966, 15 U.S.C.A. § 1451 et seq., which requires truth in packaging, the significance of which is discussed below. The label on wrapped candy was held to be prima facie evidence of the identity of the manufacturer in Curtiss Candy Co. v.

Johnson, 163 Miss. 426, 141 So. 762, [3, 4] 764 (1932) and on wrapped bread by indirect application of a Massachusetts statute in 1928, Doyle v. Continental Baking Co., 262 Mass. 516, 160 N.E. 325, [3–5] 326. Brands on livestock have long been evidence not only of identity, but ownership, both by statute and court. Wigmore on Evidence 3rd Ed. § 150, State v. Wolfley, 75 Kan. 406, 89 P. 1046 (1907). Contra are Murphy v. Campbell Soup Co., 62 F.2d 564 (1 CCA 1933) and compare Keegan v. Green Giant Co., 150 Me. 283, 110 A.2d 599 (1954) (with dissent).

As early as 1895, Pittsburgh, Ft. W. & C. Ry. Co. v. Callaghan, 157 Ill. 406, 41 N.E. 909, held that the lettering on the cab of a locomotive was prima facie evidence of ownership of the engine, and in our Flood v. Belfast & Moosehead Lake Railroad Co., 157 Me. 317, 319, 171 A.2d 433, seven years after *Keegan,* the marking on the engine was accepted as evidence of operation.

The tariff Act of 1930, 19 U.S.C.A. § 1615(2) provides that labels on merchandise indicating foreign origin are prima facie evidence of foreign origin.

In "Rules of Evidence for the United States District Courts and Magistrates" proposed by the Committee of the Judicial Conference of the United States (March 1969), Rule 9–02(g) grants presumptions of authenticity to "Trade Inscriptions and the Like. * * * purporting to have been affixed in the course of business and indicating ownership, control, or origin." The rationale expressed in the Advisory Committee's Note, p. 230, is that practical considerations reduce the possibility of unauthenticity to a minimum, infringement of trade marks involves severe penalties and inducements to the buying public to rely on trade names offers substantial protection.

Facts recited by labels were accepted as evidence of the facts asserted in State v. Lizotte, Me., 230 A.2d 414 [3] 417 and cases cited. Additional cases are Cusimano

v. State, 27 Ala.App. 407, 173 So. 490, [3] 491 (1937); and Dabney v. State, 141 Tex. Cr.R. 16, 146 S.W.2d 1000, [6] 1003 (1940).

■ There is an additional feature bearing upon this issue in the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq., (Drug Act). Section 331 not only prohibits the introduction into interstate commerce by the maker of any drug that is adulterated or misbranded, but the receipt thereof and delivery of the same for pay. It also prohibits the alteration of the labeling with respect to a drug held for sale after shipment in interstate commerce. Section 333 provides penalties. The term "drug" within the meaning of that Act means articles recognized in the official United States Pharmacopoeia or official National Formulary, "or any supplement to * * * them." The three chemical substances contained in the B-D Kit (Benzalkonium Chloride solution, Sodium Fluoride, and EDTA ($Na_2$) are listed in the official United States Pharmacopoeia.[1] This federal Act places an obligation on both the manufacturer who ships interstate and the purchaser for resale to truthfully "brand" and maintain quality (no adulteration) as represented. This obligation raises a presumption "that every man, in his private and official character, does his duty, until the contrary is proved." The President, Directors, and Company of the Bank of the United States v. Dandridge, 12 Wheat. (U.S.) 64, 69, 6 L. Ed. 552, and same as to corporations, Cincinnati, New Orleans & Texas Pacific Railway Company v. Rankin, 241 U.S. 319, 327, 36 S.Ct. 555, 60 L.Ed. 1022, and the principle is recognized in Lyons v. Jones, 117 Me. 117, 118, 102 A. 976.

As an additional consideration addressed to the probability of trustworthiness is the unlikeliness of any motive to falsify the assertions in the certificate.

The Drug Act is applied very broadly. See decisions in U.S.C.A. under the reference sections, and particularly Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, [4–5], [6,7] 109, 93 L.Ed. 52 (1948), Nature Food Centres, Inc. v. United States, 310 F.2d 67, [4, 5] 70 (1 CCA 1962), cert. den. 371 U.S. 968, 83 S.Ct. 552, 9 L.Ed.2d 539, United States v. An Article of Drug * * * Jenasol R. J. Formula "60" 320 F.2d 564, [1–3], [4] 568 (3 CCA 1963), cert. den. 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313.

■ For the reasons given it is held that the certificate of the manufacturer attached to the interior of the box containing the B-D Kit has upon its face sufficient trustworthiness to raise a presumption as to the truth of the facts asserted and would permit a jury to so find. Were a *Keegan* situation to be presented again, the possible application of this decision would require consideration.

Addressing this conclusion to the first issue we answer in the affirmative, with qualifications. The certificate constitutes prima facie evidence on the quality of the drugs mentioned, in the sense of their being pure as distinct from adulterated. The certificate does not constitute prima facie evidence of the characteristics or attributes of the drugs (nature and, in a second sense, quality) as to which more will be said under Issue Four.

### Issue Two

■ We answer in the affirmative with the same qualification as to the words "nature" and "quality" as those words apply to the *function* of the drugs.

"(I)t is relevant to put in evidence any circumstances which tend to make the proposition at issue more or less improbable." State v. Witham, 72 Me. 531, 537.

### Issue Three

■ The answer must be in the alternative. We have said that the certificate is

1. Pharmacopoeia, 16th Rev. 1960 pp. 82, 665, 984; 1970 Revision pp. 67, 627, 217.

prima facie evidence that the swab and tubes contain in pure form what they purport to contain and in the amounts asserted. Whether or not random sample testing is essential as a foundation for the admissibility of the analysis result depends upon the function of these chemicals. If it be established that their function is only to antiseptically take and preserve the sample and can in no way affect the blood alcohol present, random sampling of a given batch of Kits (those bearing the same control numbers) is not necessary. If variation from the asserted purity and amount of the respective chemicals can affect the blood alcohol present, random sampling is necessary to give the process prima facie reliability and make testimony of the resulting test admissible within the terms of 29 M.R.S.A. § 1312.

The matter of random sampling of the chemical content of sealed ampoules which are an integral part of the blood alcohol testing device known as Breathalyzer, for the purpose of laying a foundation for the admission of the test result, has been considered in two jurisdictions. The sampling confirmed the represented content and it was held that such confirmation was sufficient prima facie proof that the chemicals were of the proper kind and properly compounded. State v. Baker, 56 Wash.2d 846, 355 P.2d 806, [1] 811 (Wash.1960) and State v. Miller, 146 N.W.2d 159, [1] 163 (N.D.1966).

### Issue Four

█ We answer in the negative. From neither the facts submitted nor the certificate, do the attributes and function of the Benzalkonium Chloride solution on the swab, the Sodium Fluoride, and Disodium Edetate [EDTA (Na2)] in the tubes, appear. Inferentially the white powders in the tubes are anti-coagulants, either singularly or in combination, to preserve the liquidity of the sample between taking and analysis. The Pharmacopoeia and Formulary indicate that the Benzalkonium Chloride solution is an antiseptic, used here for preparing the subject's arm for the withdrawing of the blood sample, and the same sources indicate that the function of the Sodium Fluoride and EDTA (Na2) is to prevent the sample from clotting, but the statement submitted to us does not say so, and if it did, it would not obviate the necessity of explaining to the jury the functions of these chemicals whereby the reliability of the ultimate analysis may be determined. See State v. Fox, 177 Neb. 238, 128 N.W.2d 576, 579 (1964); Rimpley v. State, 169 Neb. 171, 98 N.W.2d 868, [12] 873 (1959); State v. Kindschuh, 248 Iowa 440, 80 N.W.2d 750, [1] 752 (1957); and State v. Erdman, 64 Wash.2d 286, 391 P.2d 518, [2] 519 (1964).

It is rather obvious that the solution on the swab is purposed to get away from the use of any solution containing alcohol as a preparatory antiseptic, but an accused would be interested in and entitled to know whether its use would affect in any way the integrity of the blood sample. Likewise the accused would be interested in and entitled to know whether the powders in the tubes would in any way affect the integrity of the sample and how any inaccuracies in the respective amounts of the two chemicals would affect, if at all, the results.

We are not here faced with the "necessity" feature inherent in some exceptions to the hearsay rule, from the application of which we have concluded that the manufacturer's certificate may be accepted as prima facie evidence of the facts therein asserted. Any qualified witness can inform the jury, subject to the test of cross-examination, as to the function and effect of these chemicals.

The reliability which the jury may ascribe to the preservation and analysis of the blood sample must be shown. Upon this record the result of the blood analysis is not admissible.

So ordered.

WILLIAMSON, Chief Justice (dissenting).

I join in the opinion of the Court on the first three issues. On the fourth issue, however, I respectfully disagree and therefore dissent in the result.

The fourth issue reads:

"Does the evidence, as a matter of law, constitute sufficient foundation for the admissibility of the results of the blood alcohol test?"

The Court answers in the negative. I would answer in the affirmative.

The Court in the opinion says, "that the certificate is prima facie evidence that the swab and tubes contain in pure form what they purport to contain and in the amounts asserted." I understand the certificate is also prima facie evidence that the contents as stated "are new and have not been previously used" and that "No alcohol is used in the manufacturing procedures for these items or in the sterilization of the VACUTAINER needle."

In the instant case there has been a random sampling. Whether or not this check on accuracy is necessary is not determined.

I turn to the taking, preservation and analysis of the blood. "Each of the VACUTAINER tubes contained a granular white substance which Dr. Feagin recognized to be consistent in color and texture with the anti-coagulant indicated on the Manufacturer's Certificate as sodium fluoride and EDTA (Na₂) * * * Mr. Roy, being a duly qualified chemist, conducted a test and analysis of the blood sample pursuant to the modified Dubowski method for the purpose of determining the alcohol concentration therein." I quote from the agreed statement of facts. If the case had gone to trial, Dr. Feagin and Mr. Roy would have been available for cross-examination. In light of their professional training, it is, it seems to me, implicit in the stated facts that they would know the "attributes and function of the Benzalkonium Chloride solution on the swab, the Sodium Fluoride, and Disodium Edetate [EDTA (Na₂)] in the tubes."

The Pharmacopoeia and Formulary, with its standing under our statutes, gives the answers we would expect—one an antiseptic and the others anti-coagulants.

The cases cited by the Court on the fourth issue, in each of which the evidence was held admissible, are not label or certificate cases. In my view, for this reason they do not reach the heart of the case before us.

Having accepted the worth of the certificate as prima facie evidence, I have no difficulty in accepting with like weight the evidence I have noted covering the taking, preservation and analysis of the blood sample.

I would hold the blood test to be admissible. Thus the agreement of the defendant to plead guilty to the charge of operating a motor vehicle while impaired by the use of intoxicating liquor would come into force.

I am authorized to state that Mr. Justice POMEROY joins in this dissent.