STATE OF NEBRASKA, APPELLEE, v. TOMMY FOX, APPELLANT.

128 N. W. 2d 576

Filed May 29, 1964.   No. 35679.

John P. Jensen, for appellant.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The defendant was charged in the county court of Buffalo County with unlawfully operating a motor vehicle while under the influence of alcoholic liquor, second offense, in violation of a statute relating to the operation of motor vehicles.  Trial was had to a jury. The jury rendered a verdict of guilty.  The defendant was fined $300, and in addition was sentenced to the Buffalo County jail for a period of 30 days.  The case was tried to a jury in the district court.  The jury found the defendant guilty as charged.  The defendant

was sentenced to 30 days in the Buffalo County jail, ordered to pay a fine of $300, and his driver's license was suspended for a period of 1 year, the suspension to commence upon the defendant's release from the jail or payment of the fine, whichever was the later. The defendant filed a motion for new trial which was overruled, and defendant appealed to this court.

The record discloses that Vern Scharff, a trooper connected with the Nebraska Safety Patrol, was on duty on May 25, 1963; that his attention was first attracted to the defendant when this witness was following a white 1963 Chevrolet from California which was about 100 yards ahead of him going east. He saw a blue Nash, which was traveling west, coming from the wrong lane of traffic back to the right lane. He testified that the right wheels of the white Chevrolet went off onto the shoulder of the road, and the blue Nash was in the eastbound lane of traffic. He turned around and followed the blue Nash. He stopped the defendant at Twenty-fifth and L Streets, near Fee's O. K. Tire Service in Kearney. After he stopped the defendant he asked him for his driver's license which was produced. The defendant was unsteady on his feet when he got out of his car. He was asked if he could walk toe-to-heel, and he was unable to do so. This witness smelled liquor on the defendant's breath. He arrested the defendant for driving while under the influence of alcohol. The defendant said he had not had anything to drink. He was taken to the police station where the normal tests of finger-to-nose and walking the line were run, both of which he failed to perform. The defendant's speech was a little bit slurred, and his eyes were bloodshot. The implied consent law was explained to him. He was asked for either a blood or urine specimen to be tested for alcoholic content. He consented to a blood test to be taken by a doctor of his own choice, Dr. Smith. He was taken to the clinic where Dr. Smith had his office. The blood specimen was drawn, and it was

sealed in the presence of this witness. It was turned over to this witness, and he took it to Axtell and gave it to trooper Westrope at 1:25 p.m. The blood specimen was put in a small glass tube which this witness was told was sterile. A small piece of paper was taped on the tube with scotch tape and contained the name of the defendant, the arresting officer's name, and the time the blood test was taken. This witness further testified that the doctor injected the blood from the needle directly through the cork of the test tube.

On cross-examination this witness testified that Dr. Smith took the test in his presence; that he saw the doctor put an antiseptic on the defendant's right arm; and that he told the doctor to use a nonalcoholic antiseptic because the blood was being used for an alcoholic-content test. The doctor said the antiseptic was a nonalcoholic antiseptic. The doctor wiped the antiseptic on the defendant's arm. This witness asked the doctor if there was an anticoagulant in the tube and the doctor said there was. He was not sure if the doctor gave that answer, but his technician did.

Dr. H. V. Smith testified that on May 25, 1963, the defendant was in his office, having been brought in by a patrolman to obtain a sample of blood for alcoholic-content determination. The doctor withdrew a sample of blood. To do this, the doctor explained, there was a disposable syringe and needle which were sterile. Such a syringe and needle were obtained and a tourniquet was placed on the defendant's right arm. The needle was inserted into a vein, and the blood was withdrawn. The needle was then placed through the cap of the tube that contained some anticoagulant. The doctor said he used no antiseptic. He further testified that the tube was never unsealed; that these tubes were sterile; that the blood was put into it through a sealed rubber cork; that the injection of the needle into the tube would in no way affect the seal of the container;

that he withdrew the blood from just one arm; and that he only inserted the needle once.

Merrill Westrope testified that he was a trooper connected with the Nebraska Safety Patrol; that on May 25, 1963, he met trooper Scharff in Axtell about 1:25 p.m., and received a glass tube from him which contained red liquid which he assumed was blood; and that the tube was sealed and a label was on the tube containing the names of the defendant and the arresting officer, the time the specimen was taken, and the county where it was taken. He examined the specimen to see if it would leak, put it in his shirt pocket, and then arranged by radio to meet Dr. Bunoan at 2 p.m., at the doctor's laboratory in the Holdrege Hospital. He gave the specimen to the doctor, and the doctor proceeded to set up his apparatus to run the test.

Dr. P. Bernardo Bunoan testified that he was graduated from the Guadalajara University of Mexico and had studied in the United States; that he majored in bacteriology and chemistry; that for the past 25 years he had worked in the field relating to the effects of various chemicals or substances on the body and body fluids; that he moved to Holdrege in December 1959; that he was qualified by the Nebraska Department of Health to conduct chemical tests for blood alcohol content and had obtained a certificate to conduct chemical examinations in Nebraska; that he knew the methods approved by the Nebraska Department of Health for determining the alcoholic content of blood; that the number one method is the distillation method and the number two method is the calorimetric method; that he uses both methods and his laboratory is the only laboratory in the State of Nebraska using both methods; and that he was qualified by the Nebraska Department of Health to use both methods. He further testified that on May 25, 1963, trooper Westrope called him and he met the trooper at the Holdrege Hospital at 2 p.m.; that Westrope delivered a specimen of blood in a test tube which was sealed and

had a label fastened on it with scotch tape; and that after he received the specimen, he looked at it to see whether it was coagulated, or if it had jelled. He further testified that if it was coagulated he would have to process it to liquify it; that this blood specimen was not coagulated; and that he used both methods to doublecheck his findings. The doctor's findings were that under the number one test there was a .36 percent alcoholic content, and the number two method determined the same quantity of alcoholic content. Both tests showed a .36 percent of alcohol by volume. The doctor further testified that a .15 percent alcoholic content would be conclusive evidence that a person was under the influence of alcohol.

On cross-examination the doctor was asked if there was an anticoagulant in the blood sample that had the defendant's name on it. He said he presumed there was because the blood was liquified; and that there are only two anticoagulants recognized for blood alcohol determination, number one is sodium fluoride with an oxylate, which test can be done at any time within 1 month, and number two is a combination of soduim citrate and calcium oxylate, which test should be done within 24 hours.

The record shows that a demand was made upon the county attorney for a copy of this doctor's report, but it had never been received. Objection was made to the answers of the doctor to questions for that reason. The objection was overruled.

Dr. Bunoan further testified, on cross-examination, that the wrong type of anticoagulant can contaminate the blood and make the blood alcohol test no good. The doctor was asked the following questions. "Q So that a test that is made—a sample that is taken without cleaning the skin—you can't get a proper finding on that either, can you. A No. And another thing is the anticoagulant that they use." The doctor went on to say that he recommended to the policemen that he had tubes and would give them some, because that was the kind that

was recommended throughout the world for this kind of test. But when they used the kind of anticoagulant they use, "I don't know what happens in there. They even use that for blood sugar tests, and it certainly isn't good for blood alcohol tests; it produces acetone in the blood. That's why when they bring me urine for alcohol determination I always test for sugar and acetone to be sure it isn't diabetes, because when you have diabetes the result of the blood alcohol determination will be high. Q In other words, if a man has diabetes you might stab him and take his blood and he would show alcohol in his blood. A That's right. Q And if you use the wrong anticoagulant, that will throw your test off, too. A It would throw it either down or up, yes. Q Then if there is evidence that there was an anticoagulant put in it, then you have to know how much and what it was or you can't make a valid test, can you. A That's right, yes."

On redirect examination the doctor was asked the following questions and gave the following answers: "Q Now, Doctor, using an anticoagulant, would that have any effect on the test if—A Definitely. That's the worst thing that can happen in the alcohol test, like I have been explaining to all the police officers,—that I advised them to take this anticoagulant that I have there,—sodium fluoride,—to use it because it is the most effective preservation of alcohol that is in the blood; there is no other anticoagulant recommended; it preserves the alcohol for a total of two to three weeks. And when you take the patient to the hospital or clinic they should have a test tube containing anticoagulant. We have a special anticoagulant for determining blood sugar; and the same is true with alcohol." The doctor further testified that the use of an anticoagulant could decrease the amount of alcohol or increase the amount of alcohol in the blood sample; and that acetone would increase the amount of alcohol in a blood sample. He was asked if he was familiar with what type of anticoagulant was used

in the test tubes to which Dr. Smith referred, and said that it was sodium citrate and calcium oxylate. He then testified that the anticoagulants are put in the test tubes before they are shipped to the laboratory, and come sterilized with a disposable needle.

On recross-examination of the doctor the following questions were asked and answered: "Q I am referring to this sodium citrate. I will ask the question once more. This sodium citrate oxylate is what is used for a blood count. Isn't that right? A Yes. Q And that's the wrong kind to use in testing for alcohol. A No, not exactly the wrong kind, * * *." Then the doctor said that that kind of anticoagulant—sodium citrate and calcium oxylate—are prepared in a certain percentage, and there must be just a certain amount put in the test tube, and that they do not use the same proportion for a blood count as would be used for testing for alcohol. "Q And the question is: if there was anticoagulant in this test tube that was delivered to you that had the amount of sodium citrate oxylate in there that is used to test for a blood count, then that was the wrong kind and throws your test out, doesn't it. A Just a minute. No, I don't want to give that impression. It isn't the wrong kind. It is usable, but— Q Well, it could be the wrong proportion, couldn't it? A It could be the wrong proportion. Q So that when you got your test of .36% that might be incorrect because you don't know what the proportion was. Isn't that right? A I absolutely agree with you on that point; because that's what I've been testifying in court at McCook."

There is evidence by the doctor as to individuals who have consumed intoxicating liquor over a period of time and become used to it, that the alcoholic content of .15 percent and perhaps up to a .36 percent would not cause the user to show the degree of intoxication or state thereof he was in at the time, because this would vary with individuals.

The defendant's testimony with reference to the test

made by Dr. Smith was to the effect that Dr. Smith "daubed" his arm with something that smelled like alcohol before he injected the needle into his arm.

The defendant offered several witnesses who testified to his truth and veracity in the community, and that his reputation was good in that respect. In addition, there is testimony on behalf of the defendant that he was not under the influence of intoxicating liquor at the time of his arrest. There is, in addition, the testimony of Dr. Smith relating to treatment of one of defendant's feet which defendant claimed interfered with his ability to walk toe-to-heel in any condition.

The defendant moved to strike out all of the testimony with reference to the chemical test and the result of the chemical test for the reasons that the evidence was insufficient to permit such test to go to the jury, and that the undisputed testimony of the plaintiff's own witness was that such blood was contaminated and not properly taken, and that the jury be instructed to disregard the results of such tests entirely. This motion was overruled.

Then the defendant moved for a mistrial for the reason that prejudicial evidence in the nature of the chemical test had been received over objection of the defendant, which was overruled.

At the close of all of the evidence the defendant renewed all motions made at the close of the State's evidence and the same were overruled.

We have not summarized other evidence given in the defendant's behalf for the reason that the defendant predicates error as follows: The trial court erred in overruling the defendant's motion to strike out the evidence of the chemical test of his blood made at the close of the State's evidence and at the close of all the evidence; and the trial court erred in overruling the defendant's motion to declare a mistrial made at the close of all the State's evidence and at the close of all the evidence in the case.

The statutes involved in this appeal are in part and substance as follows.

Section 39-727, R. S. Supp., 1961, provides in part: "It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle while under the influence of alcoholic liquor * * *. Any person who shall operate or be in the actual physical control of any motor vehicle while under the influence of alcoholic liquor * * * shall be deemed guilty of a crime and, upon conviction thereof, shall be punished as follows: * * * (2) if such conviction is for a second offense such person shall be imprisoned in the county jail for not less than five days nor more than three months, and shall be fined the sum of three hundred dollars, and the court shall, as part of the judgment of conviction, order such person not to drive any motor vehicle for any purpose for a period of one year from the date of his final discharge from the county jail, or the date of payment or satisfaction of such fine, whichever is the later, and shall order that the operator's license of such person be revoked for a like period, * * *."

Section 39-727.01, R. S. Supp., 1961, provides in part: "In any criminal prosecution for a violation of section 39-727, relating to driving a vehicle while under the influence of intoxicating liquor, or of section 28-403.01 when it is charged that defendant's unlawful operation of a motor vehicle consisted of the operation of a motor vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's body fluid at the time alleged, as shown by chemical analysis of the defendant's blood, * * * shall give rise to the following rebuttable presumptions: * * * (3) If there was 0.15 per cent or more by weight of alcohol in the defendant's body fluid, it shall be presumed that the defendant was under the influence of intoxicating liquor at the time the specimen was taken. The presumptions thus arising shall not be conclusive but shall be sufficient to establish a prima facie case upon the issue of whether or not the

defendant was under the influence of intoxicating liquor. Other competent evidence may be introduced upon such issue, and the presumptions arising and such other evidence, if any, shall all be considered in determining the guilt or innocence of the defendant."

Section 39-727.02, R. R. S. 1943, provides: "Tests to be considered valid under the provisions of section 39-727.01 shall have been performed according to methods approved by the Department of Health and by an individual possessing a valid permit issued by such department for this purpose. The department is hereby authorized to approve satisfactory technics or methods and to ascertain the qualifications and competence of individuals to perform such tests and to issue permits which shall be subject to termination or revocation at the discretion of the department."

Section 39-727.03, R. S. Supp., 1961, sets forth the implied consent rule, and provides as follows: "Any person who operates or has in his actual physical control a motor vehicle upon a public highway in this state shall be deemed to have given his consent to submit to a chemical test of his blood, * * * for the purpose of determining the amount of alcoholic content in his body fluid. The test shall be administered at the direction of a law enforcement officer whenever the person has been arrested for any offense involving operating a motor vehicle under the influence of alcoholic liquor in violation of a statute or a city or village ordinance when the arresting officer has reasonable grounds to believe that before his arrest the person was driving while under the influence of alcoholic liquor."

Section 39-727.04, R. S. Supp., 1961, provides in part: "The person so arrested or taken into custody may choose whether the test so required shall be a chemical test of his blood or urine, or of his breath if equipment for testing breath is then and there available. Only a physician, * * * acting at the request of a law enforcement officer may withdraw blood for the purpose of determin-

ing the alcoholic content therein; * * *. The person tested shall be permitted to have a physician * * * of his own choosing administer a chemical test in addition to and following the test administered at the direction of the law enforcement officer. * * * Upon the request of the person tested, the results of the test taken at the direction of the law enforcement officer shall be made available to him."

Section 39-727.06, R. R. S. 1943, provides: "Any test made under the provisions of sections 39-727.03 to 39-727.12, if made in conformity with the requirements of section 39-727.02, shall be valid for the purposes of section 39-727.01, and shall be competent evidence in any criminal prosecution under a state statute or city or village ordinance involving operating a motor vehicle while under the influence of alcoholic liquor."

The case of Otte v. State, 172 Neb. 110, 108 N. W. 2d 737, sets forth statutes that are pertinent to the instant case, although that case and the factual situation is dissimilar to the present case. This court held, citing Vore v. State, 158 Neb. 222, 63 N. W. 2d 141: "A statute providing that a presumption of intoxication arises under a determination that the amount of alcohol in the subject's body fluid at the time in question is 0.15 percent or more by weight, as shown by chemical analysis, is in derogation of the common law and subject to strict construction." In that case the registered nurse who took the blood sample was not acting under the direction of a physician. The court further said: "The words *Tests to be considered valid * * * shall*" would indicate that it was the intention of the Legislature to condition the right to use the tests on meeting the two requirements of this section: First, an analysis by an individual who had been issued a permit to make such analysis; and second, an analysis according to a method approved by the Department of Health."

The defendant argues that in the instant case the evidence is undisputed that the blood sample was placed

in a vial containing anticoagulant which affected the test of the blood as to alcoholic content; that the burden of proof was on the State to establish at least a prima facie case that the blood sample was properly taken and was not contaminated, which the State failed to prove when the burden of proof was on it, for the reason that the evidence establishes that the blood was contaminated by anticoagulant in the vial in which it was inserted; and that the defendant's motion relating to striking the evidence and that the jury be instructed to disregard the same should have been sustained.

It is obvious from the record that all the statutory foundational requirements for the admission of the result of the blood analysis have been met, and such evidence was competent and properly admitted. There is nothing in the statutes which, either expressly or inferentially, prohibits the use of an anticoagulant for the purpose of preserving the blood during the interim from withdrawal until the test. Any evidence to the effect that the alcoholic content of the defendant's blood might have been affected by the presence of an improper amount of anticoagulant in the test tube, or by the use of an antiseptic to cleanse the arm before injection with the syringe and needle, would have no effect upon the admissibility of the test, but, rather, such evidence would go only to the weight and credibility of the test.

It was not the legislative intent that all possibility of inaccuracy or imperfection in the test should be excluded before being received in evidence. It is apparent that the intention of the Legislature was that such tests are admissible, and prima facie proof, whenever it be established that the statutory requirements are satisfied, which is true in the instant case, and the presence or absence of other facts which might reflect upon the verity of the test results affect only the matter of rebuttal of the statutory presumption, not the admissibility of the test results, as such.

The foregoing constitutes the State's argument in this case.

The admissibility of the results of the test of the defendant's blood in the instant case is established by the decision in Schacht v. State, 154 Neb. 858, 50 N. W. 2d 78, wherein this court said: "The defendant assigns as error the evidence of the chemist in the laboratory of the state Department of Health who tested the blood samples taken from the defendant, and the result which showed an alcoholic content in the blood sufficient to produce intoxication. Objection is also made to instruction No. 6 which informed the jury of the effect of sections 39-727, 39-727.01, and 39-727.02, R. S. Supp., 1949. The chemist described in detail the method employed, as well as her qualifications for doing this work. Ample foundation was laid for the admission of her findings as to the alcoholic content of the blood specimens. Instruction No. 6 correctly informs the jury as to the evidence required on the part of the State by the sections of the statute hereinbefore cited. No error in the admission of the result of the test or in the giving of the instruction in connection therewith is shown."

The defendant, in his motion for new trial, stated: "a) The County Attorney failed to deliver to counsel for defendant the results of the blood test taken before trial, although the same was demanded. Objection was made to the offer of any evidence concerning the same during trial and at the time the witnesses for the State were offered on this particular."

The defendant's assignments of error do not raise this issue, neither did the defendant's motions heretofore mentioned raise this issue, but during the course of the trial the defendant made a request for the results of the blood test from the county attorney.

Section 39-727.04, R. S. Supp., 1961, does make provision that the result of such a test would be available to the defendant. No request was made to the trial court prior to the trial that the result of the blood test

of the defendant be furnished to him, nor was any order requested to that effect. We believe that under these circumstances prejudicial error was not committed by the trial court.

From a review of the record we find no prejudicial error.

We conclude that the judgment of the trial court should be affirmed.

AFFIRMED.