STATE OF NEBRASKA, APPELLEE, v. FRANK BRITTAIN, APPELLANT.

325 N.W.2d 141

Filed October 22, 1982. No. 44448.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Paul L. Douglas, Attorney General, and Patrick T. O'Brien, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

Following a trial to a jury the defendant, Frank Brittain, was convicted of motor vehicle homicide and was sentenced to a term of imprisonment in the Nebraska Penal and Correctional Complex of not less than 1⅔ years and not more than 5 years. On appeal to this court he assigns as error the admission into evidence of a blood alcohol test, and improper jury instructions. We affirm.

The motor vehicle accident out of which this charge arose occurred at 22nd and Dodge Streets in Omaha on the evening of January 18, 1981. The defendant was driving the motor vehicle in which the victim, Jerry Cline, was a passenger. The unlawful act with which the defendant was charged, which it was claimed made this death a motor vehicle homicide, was a violation of Neb. Rev. Stat. § 39-669.07 (Reissue 1978), driving while intoxicated.

Police Officer Donald Stephens, after making a preliminary examination at the scene of the accident, testified that he went on to the Lutheran Medical Center, where the victim and the defendant had been taken, to conduct a further investigation. He said he observed the defendant being treated and that he was bleeding profusely from the head. He went on to say he observed that the defendant would have to be told two or three times by the medical personnel to do certain things to assist them in their treatment of him. After obtaining permission to talk to the defendant, the officer said he attempted to do so and was able to smell a strong odor of alcohol. The officer testified that he then proceeded to read to the defendant the implied consent rights advisory. In that connection the following testimony of the officer is instructive: "Again, I started with question number one, 'You are advised that you are under arrest for suspicion of operating a motor vehicle while under the influence of intoxicating liquor or of any drugs. Do you understand this?' His reply was, 'No, I don't understand. I don't know what you are talking about.' Then question number two, 'You are further advised that you are required by the State of Nebraska to submit to a chemical test of breath, blood or urine as directed by the arresting officer for a determination of alcoholic content. When an officer directed that you may take a blood or urine test, you may choose a blood or urine test. Do you understand this?' He stated, 'No, I don't understand.' Past that as far as verbatim goes, I couldn't say. He kept telling me he had not been involved in a traffic accident and that he didn't own a pickup truck and he wasn't driving and he didn't know what I was talking about and there is nothing wrong with me. I am not hurt. What is all this? Question number three, 'You are advised that if you refuse to submit to this chemical analysis of breath, blood or urine as directed by the arresting officer,

you will be charged with an additional offense of refusing to submit to a test, which provides for a fine or jail and a loss of license if you are convicted. Do you understand this?' I received the same answer, that he didn't know what I was talking about. Question number five deals with the tests available when a person is injured such as this and taken to a hospital, we request a body fluid test, blood or urine. The practicality of administering a breath test becomes impractical at this point because the person cannot be transported to the police station to take this breath test. They are offered the choice of blood or urine. That deals with question number five or statement number five. Number six is, 'Do you wish to submit —' and there is a list of breath, blood or urine. Again, he said, 'I don't want to take any test. There is nothing wrong with me. I was not involved in a traffic accident. I was not hurt.' I received responses such as this the entire time I was attempting to advise him of these rights."

According to Dr. Steven A. Schwid, one of the attending physicians at the hospital, the defendant appeared to be confused and seemed to have amnesia for the events just preceding his arrival, and had an odor of alcohol on his breath. The only other medically related evidence as to the defendant's condition came from the medical technologist, Lynette Molek, who obtained the blood sample from the defendant. She testified that he was "in pretty bad shape," and when she asked the police officer if the defendant knew what she was going to do, she said the police officer told him that this was the lady who was to draw a blood sample. She proceeded to do so, during which time the defendant three times said "I am sorry."

It is the defendant's contention that, having refused to submit to the blood test, it should not have been taken, and, consequently, the results were not admissible. Neb. Rev. Stat. § 39-669.15 (Reissue

1978). However, Neb. Rev. Stat. § 39-669.10 (Reissue 1978) provides that "Any person who is unconscious or who is otherwise in a condition rendering him incapable of refusal, shall be deemed not to have withdrawn the consent provided by section 39-669.08 and the test may be given." It is the State's contention that the defendant's condition was such as to render him incapable of refusing the test. The trial court agreed and received the test into evidence.

We have been unable to find any Nebraska cases dealing directly with the admissibility of blood alcohol tests under these circumstances. However, in *Wohlgemuth v. Pearson,* 204 Neb. 687, 285 N.W.2d 102 (1979), we were confronted with the other side of this question. We cited with approval the following language from *Campbell v. Superior Court,* 106 Ariz. 542, 479 P.2d 685 (1971): " '[A] refusal to submit to the test occurs where the conduct of the arrested motorist is such that a reasonable person in the officer's position would be justified in believing that such motorist *was capable of refusal* and manifested an unwillingness to submit to the test.' " (Emphasis supplied.) *Id.* at 691, 285 N.W.2d at 104. We went on to say: "[A]ny other result would force the director and the trial court into a psychological guessing game as to the appellee's state of mind and his degree of capability of comprehension." *Id.* at 691, 285 N.W.2d at 104.

Although affirming the trial court which had suppressed the test, the Montana court in *State v. Mangels,* 166 Mont. 190, 531 P.2d 1313 (1975), laid down the following rule for guidance in this area: "Section 32-2142.1, R.C.M. 1947, limits the officer's discretion to those cases where the subject is incapable of refusing the test. Here, we only require that the incapacity be determined on the basis of the best evidence which is reasonably available to the officer." *Id.* at 194, 531 P.2d at 1315.

In order to offer the blood test in evidence, it was

incumbent upon the State, as a foundational requirement, to demonstrate to the trial court that it was taken at the direction of the officer at a time when the defendant was "incapable of refusal" of the test. This is not unlike the responsibility which the trial judge has in satisfying himself that the *Miranda* warnings have been given as a foundation for the introduction in evidence of a defendant's "in-custody statement." In this regard, relying upon *United States v. Watson,* 469 F.2d 362 (5th Cir. 1972), this court adopted, in *State v. Irwin,* 191 Neb. 169, 214 N.W.2d 595 (1974), syllabus 8, which reads as follows: "In determining whether the State has shown the admissibility of custodial statements by the requisite degree of proof, this court will accept the factual determination and credibility choices made by the trial judge unless they are clearly erroneous and in so doing we will look to the totality of the circumstances." We believe that the record clearly supports the finding which the trial court obviously made in ruling upon the admissibility of the test, i.e., that the blood sample was taken from the defendant at a time when he was incapable of refusing to give the sample. That determination will not be disturbed by us on appeal.

Defendant's other principal attack upon the admissibility of this test concerns the length of time that elapsed from its taking until it was refrigerated at the police station. He cites *State v. Gerber,* 206 Neb. 75, 291 N.W.2d 403 (1980), in which we said that before the State *may offer in evidence* the results of a breath test "the State must prove . . . (3) That the test was properly conducted in accordance with a method currently approved by the Nebraska Department of Health . . . ." *Id.* at 90-91, 291 N.W.2d at 411-12. He then points out that the regulations of the State of Nebraska Department of Health rules relating to analyses of blood for alcohol content require that "While not in transit to be tested or while

under examination, all blood specimens shall be refrigerated.''

Officer Stephens testified that he received the defendant's blood sample at approximately 2:45 in the morning, placed it in his shirt pocket, continued to investigate the accident, and at 8 o'clock in the morning, some 5¼ hours later, he turned it over to the property officer at the police station for refrigerated storage.

The defendant contends that during this 5-hour period the blood was neither in transit to be tested nor was it in the process of being tested. We do not agree. The rules do not require the officer, once he obtains the blood sample, to discontinue all activities and rush the sample to the police property room. We believe that the record adequately supports the trial court's finding that the State had proved that the blood specimen was properly preserved, within the meaning of the regulations of the Nebraska Department of Health previously referred to. Further, the court was justified within the meaning of *State v. Gerber, supra,* in finding that the "test was properly conducted in accordance with a method currently approved by the Nebraska Department of Health" and therefore was *admissible* in evidence. As we stated in *State v. Kerns,* 201 Neb. 617, 621, 271 N.W.2d 48, 51 (1978): "A determination of admissibility of physical evidence generally rests within the sound discretion of the trial court and will not be reversed except for a clear abuse of discretion." There was no abuse of discretion.

The defendant also contends that the test should not have been admitted because, as Neb. Rev. Stat. § 39-669.09 (Reissue 1978) requires that the person tested shall be permitted to have a physician of his choice perform additional tests, the officer must advise the defendant of this right. Such requirement is wholly inapplicable where the test is involuntary.

Also, we held in *Zadina v. Weedlun,* 187 Neb. 361, 190 N.W.2d 857 (1971), that no such requirement is imposed upon the officer by virtue of that statute.

The defendant also insists that there was no proof that the testing device was in proper working order. The answer to that contention is found in the record, which contains sufficient evidence to support a finding that the testing device was in proper working condition.

Finally, the defendant objects to the court having given its own instruction No. 11, and refusing to give the defendant's requested instruction No. 1. These instructions relate to the requirements of *Gerber, supra,* that "before the State may offer in evidence the results of a breath test for the purpose of establishing that a defendant was at a particular time operating a motor vehicle while having ten-hundredths of one percent or more by weight of alcohol in his body fluid, the State must prove the following: (1) That the testing device or equipment was in proper working order at the time of conducting the test; (2) That the person giving and interpreting the test was properly qualified and held a valid permit issued by the Nebraska Department of Health at the time of conducting the test; (3) That the test was properly conducted in accordance with a method currently approved by the Nebraska Department of Health; and (4) That there was compliance with any statutory requirements." *Gerber* at 90-91, 291 N.W.2d at 411-12. The court told the jury that in determining the weight which the evidence relating to the blood test was entitled to have, it should consider whether the four requirements had been met. On the other hand, the defendant's proposed instruction stated that if the jury found from the evidence that "the State has failed to prove any one of these four facts you must totally disregard any testimony or evidence received regarding the blood test itself and the results of the blood test."

In refusing the defendant's offered instruction, the court relied upon *State v. Fox,* 177 Neb. 238, 249, 128 N.W.2d 576, 582 (1964), in which we said: "It is obvious from the record that all the statutory foundational requirements for the admission of the result of the blood analysis have been met, and such evidence was competent and properly admitted. There is nothing in the statutes which, either expressly or inferentially, prohibits the use of an anticoagulant for the purpose of preserving the blood during the interim from withdrawal until the test. Any evidence to the effect that the alcoholic content of the defendant's blood might have been affected by the presence of an improper amount of anticoagulant in the test tube, or by the use of an antiseptic to cleanse the arm before injection with the syringe and needle, would have no effect upon the admissibility of the test, but, rather, such evidence would go only to the weight and credibility of the test."

The defendant insists that *Fox, supra,* is no longer the law in Nebraska, having been overruled by the language of *Gerber, supra,* as set forth earlier in this opinion.

We do not interpret *Gerber* in this fashion. Both cases deal with the reception of evidence, not proof of facts. Both cases impose certain foundational requirements before the test may be admitted. These requirements were satisfied in the case at bar. Neither case required that the jury reexamine the trial court's ruling on the admissibility of the tests. The defendant was not entitled to the proposed instruction and there was no error in refusing to give it.

The judgment of the trial court is affirmed.

AFFIRMED.

WHITE, J., concurs in the result.

CLINTON, J., participating on briefs.

McCOWN, J., dissenting.

Neb. Rev. Stat. § 39-669.15 (Reissue 1978) provides in part: "If a person arrested pursuant to section

39-669.08 refuses to submit to the chemical test of blood, breath, or urine required by that section, the test shall not be given and the arresting officer shall make a sworn report to the Director of Motor Vehicles." The corollary to the Nebraska implied consent statute is quoted in the majority opinion: "Any person who is unconscious or who is otherwise in a condition rendering him incapable of refusal, shall be deemed not to have withdrawn the consent provided by section 39-669.08 and the test may be given." Neb. Rev. Stat. § 39-669.10 (Reissue 1978).

In this case it is undisputed that the defendant, in specific intelligible language, refused to submit to a blood test. The State admits that the defendant refused, but contends that his other comments show that he was confused, irrational, and was therefore in a condition rendering him incapable of refusal. The State therefore argues, and the majority opinion now holds, that because he was irrational and did not know what he was doing, he was incapable of refusing to take the test. His refusal and the statutory command that the test not be taken may therefore be disregarded and the test taken anyway.

It is a contradiction in terms to hold that a person who has just refused to take a test is incapable of refusing. The only explanation for such a contradiction in terms is that, to be capable of refusing, a person must know and understand what he is doing. This court has consistently held directly contrary to that assumption. See *Wohlgemuth v. Pearson,* 204 Neb. 687, 285 N.W.2d 102 (1979). In all cases we have been able to find in which the suspect manifested a refusal to submit to a chemical test by act or by words, and even where the evidence indicated he was injured, intoxicated, confused, or did not understand the import of his refusal, the courts of this country have found the suspect capable of valid refusal. See, *Wohlgemuth v. Pearson, supra; Dolan v. Rust,* 195 Colo. 173, 576 P.2d 560 (1978); *Hoban v.*

*Rice,* 25 Ohio St. 2d 111, 267 N.E.2d 311 (1971); *State v. Hurbean,* 23 Ohio App. 2d 119, 261 N.E.2d 290 (1970).

We have been unable to find any criminal or civil case in any jurisdiction in which a court found a suspect incapable of refusal where the suspect did, in fact, manifest some sort of oral or physical refusal. Only where the suspect gave no meaningful response whatever, or where there was no understanding of the language, was a suspect found to be in a condition rendering him incapable of refusal. See, *Martinez v. Peterson, ante* p. 168, 322 N.W.2d 386 (1982); *State v. Rumley,* ____ Mont. ____, 634 P.2d 446 (1981).

Nebraska has held that a conditional or qualified refusal to take a test is not sanctioned by the act and that such a refusal is a refusal to submit to the test. Refusal occurs whenever the suspect so conducts himself as to justify a reasonable person in the position of the requesting officer in believing that the suspect understood that he was asked to submit to a test and manifested an unwillingness to take it. See *Wohlgemuth v. Pearson, supra.* In the language of this court in that case: "[A]ny other result would force the director and the trial court into a psychological guessing game as to the appellee's state of mind and his degree of capability of comprehension. . . . The evidence is overwhelming that the appellee understood he was requested to take the test and did, in fact, articulate a refusal. Therefore, the judgment of the trial court that the appellee was mentally 'incapable of refusal' does not satisfy the terms of the statute . . . ." *Id.* at 691-92, 285 N.W.2d at 104.

It is quite clear in all the cases that the defendant's manifestation or state of mind in refusing to take the test is completely irrelevant. In the case at bar the majority opinion relies on some evidence that the defendant might have been suffering from

amnesia to explain his irrational statements and to support the conclusion that he did not know or understand what he was doing when he refused. It is just as logical to assume that his lack of knowledge and understanding, if any, was due to his intoxication. In either event his state of mind is entirely irrelevant.

It is difficult enough for a police officer to determine whether or not a suspect has refused to take a chemical test without also having to decide, after a refusal, as to whether the suspect was capable of refusing. In a great many cases of driving while intoxicated the defendant probably does not know what he is doing, but it would be absurd in view of our previous cases to argue that a defendant in such a condition, who refused to take a test, was incapable of refusal.

As the Ohio court put it: "The subjective state of mind of the licensee cannot control the outcome of the proceedings, and a police officer is not required to know the state of mind of the person arrested and determine whether such person understood he was refusing to submit to the test. To require that would place an impossible burden on the arresting officer. . . . It is possible for a licensee to be in such a state of intoxication that he does not understand what is happening, and, at the same time, by words, acts and general conduct to manifest an unwillingness or outright refusal to take the test." *Hoban v. Rice, supra* at 117, 267 N.E.2d at 315.

Discussing the same issue, the Supreme Court of Colorado said: "Therefore, it is the driver's external minifestations [sic] of unwillingness or his outright refusal to take the test which are relevant, and not the driver's state of mind or his later recollection of events." *Dolan v. Rust, supra* at 175, 576 P.2d at 562.

Under the majority opinion in the present case, whenever there is a specific oral refusal to take a

chemical test, the arresting officer may then interpret the suspect's state of mind, and if the refusal is accompanied by irrational statements or indications that the suspect does not know what he is doing, the officer can administer a chemical test over the suspect's objections. In effect, the police officer is given the broad discretion to determine when a refusal is really not a refusal and to take the test in contravention of the statute. It should be noted in this connection that the present case is a criminal case in which the defendant clearly ought to have the benefit of the specific statute requiring that in the event of refusal the test shall not be taken. There is no logical or practical reason to force police officers to speculate as to whether a particular suspect's refusal to take a test was due to his state of mind or physical condition. Such a result forces police officers and the court into "a psychological guessing game as to the licensee's state of mind and his degree of capability of comprehension."

The statute authorizing a chemical test upon a person who is "incapable of refusal" should not be interpreted to allow the test to be taken where a suspect has, in fact, refused but, in the opinion of a law enforcement officer, the refusal was based on irrational or unintelligible grounds. The trial court's refusal to exclude the blood test in the present case was erroneous.

KRIVOSHA, C.J., and CAPORALE, J., join in this dissent.