STATE OF NEBRASKA, APPELLEE, v. JAMES M. WEST, APPELLANT.

350 N.W.2d 512

Filed May 18, 1984. No. 83-168.

David E. Veath of Fisher & Veath, for appellant.

Paul L. Douglas, Attorney General, and Michaela M. White, for appellee.

KRIVOSHA, C.J., and CAPORALE, J., and McCOWN and BRODKEY, JJ., Retired, and RONIN, D.J., Retired.

KRIVOSHA, C.J.

The appellant, James M. West, appeals from a judgment entered by the district court for Dawes County, Nebraska, following a jury verdict finding West guilty of unintentionally causing the death of Scott R. Smith while engaged in the unlawful operation of a motor vehicle. The trial court sentenced West to imprisonment in the Nebraska Penal and Correctional Complex for a period of 30 months, with credit given for time spent in custody. We affirm.

The record discloses that in the summer of 1982, West, then 19 years of age, was attending Chadron State College, Chadron, Nebraska. After attending two classes on the morning of August 27, 1982, West went to visit Scott Smith at Smith's trailer, which was located off-campus. The two later returned to the college, where they went to West's room in one of the dormitories. Once in the dormitory room,

Smith and West and West's roommate spoke with some friends and drank some beer. Smith and West left the dormitory room at approximately 5:30 p.m. to eat supper. During the period of time they spent in the dormitory room, West estimated that he drank two beers. However, Delores Peters, who testified at trial, stated she observed West consume three or four beers during the 45-minute period she was there. After eating supper West and Smith went to the weight room of the college for a light workout. They then went to a liquor store where Smith purchased some beer.

At approximately 7 p.m. that evening West and Smith went to the room of James Mackley, where they stayed approximately an hour. While at Mackley's room, they all drank some more beer. They then left Mackley's room and again stopped at Smith's trailer, where they remained for about 20 minutes. There is no evidence that anything was consumed while there. They then left Smith's trailer and went to the Favorite Bar, where they remained until approximately 11:30 p.m. Mackley testified that West had at least two beers at the Favorite Bar, but further admitted that West may have had more. While at the bar, West had an altercation with an individual who was acting as a bouncer at the bar. The bouncer testified at trial that, in his opinion, West was intoxicated while at the Favorite Bar. When West and Smith left the bar at 11:30 p.m., Elizabeth Oates observed them walking across the street. Oates testified that, from what she saw, West was under the influence of alcohol at that time.

At approximately 1 a.m. West and Smith met a friend, David Danner, in the college parking lot. Danner got in West's car and they then drove to Smith's trailer. At some point, traveling toward Smith's trailer, they saw Debra Boyer walking beside the road. She was crying, and the boys offered her a ride. They turned around and drove down

Maple Street. At approximately 1:40 a.m. West's motor vehicle violently struck a parked truck. As a result of the accident, Scott Smith was killed and Debra Boyer, David Danner, and West were injured. West was taken to the Chadron Community Hospital and placed under arrest.

At the hospital Officer Jeffery read West the implied consent form, and West elected to take a urine test. At approximately 4:40 a.m. Officer Jeffery obtained a urine sample from West and put it in a container obtained from a lab technician. Jeffery then took the sample to the sheriff's office, placed it in a box, labeled the containers, and put the box in a refrigerator. Officer Jeffery then went back to the scene to continue his investigation. He measured skid marks of 67 feet in length from the point of impact on the truck to the resting point of the car.

On August 30, 1982, West's urine sample was tested by Officer DaMoude. At trial Officer DaMoude detailed the procedures he followed in testing the sample. He further testified that the sample produced a value of alcohol of .299 percent. As a result of the test, West was charged with motor vehicle homicide in violation of Neb. Rev. Stat. § 28-306(1) (Reissue 1979). West entered a plea of not guilty, and the matter ultimately came on for trial. In addition to the testimony of Officer DaMoude as to the results of the urine sample, a number of witnesses were called to testify. All but one of them testified that, in their opinion, at the times they saw West, either before the accident or immediately following the accident, he appeared to be under the influence of alcohol.

West now claims error as follows: (1) The trial court erred in admitting the results of the urine test, on the ground that the test was not conducted under a method authorized by the state Department of Health, and further upon the ground that the person conducting the test did not have a valid permit at the time the test was conducted; (2) That the verdict

was unclear and ambiguous in that it did not indicate the specific grounds upon which West was found guilty; (3) That the defendant was denied a constitutionally fair trial on the ground that the jury read a newspaper account of the case during the trial; (4) That the court erred in not giving a jury instruction concerning the techniques used in conducting the urine test; and (5) That the sentence imposed was excessive.

West bases his first claim upon the argument that at the time Officer DaMoude performed the urine analysis, the Class B permit which he held did not authorize him to conduct tests pursuant to method 3-A5, the method in fact used to analyze the urine, but, instead, authorized him to conduct urine tests pursuant only to method 3-A2. While the permit first issued to Officer DaMoude did list method 3-A2 instead of 3-A5, the record is clear that this was a typographical error and that subsequent to the time the 3-A5 test was conducted, but before trial, the Department of Health issued a new permit to Officer DaMoude correcting the permit to list the 3-A5 method. The permit was reissued retroactively, so it became effective prior to the time that Officer DaMoude performed the test on the defendant's sample. Furthermore, it is clear that Officer DaMoude did, in fact, receive authorization from the state Department of Health to perform the 3-A5 test, though the permit issued to him was in error in that regard. The statute in question, Neb. Rev. Stat. § 39-669.11 (Reissue 1978), provides for the conditions under which such a test will be admissible in evidence. The statute provides in part:

> Tests to be considered valid shall have been performed according to methods approved by the Department of Health and by an individual possessing a valid permit issued by such department for such purpose. The department is authorized to approve satisfactory techniques or methods and to ascertain the qualifications and

competence of individuals to perform such tests and to issue permits which shall be subject to termination or revocation at the discretion of the department.

It is clear that the state Department of Health ascertained the qualifications and competence of Officer DaMoude and determined that he was competent to conduct tests pursuant to the 3-A5 method. The error in the certificate did not change that fact. A certificate is merely one of the methods whereby the fact that a permit has been issued can be determined. At the time that the test was conducted, Officer DaMoude did in fact *hold* a valid permit issued by the Nebraska Department of Health, though the language of the permit, due to a typographical error, was incorrect. We do not believe that this made Officer DaMoude's authority invalid, nor did it invalidate the test. To so hold would be to carry form over substance to a ridiculous extreme. Typographical errors have been considered by other courts, and where it is clear that the document, through a scrivener's error, does not recite the truth of the matter, such errors have been ignored, and the truth instead considered. See, *Brunswick Corporation v. Haerter*, 182 N.W.2d 852 (N.D. 1971); *Pellegrino v. State Bd. of Elections*, 100 R.I. 71, 211 A.2d 655 (1965); *State v. Boushee*, 284 N.W.2d 423 (N.D. 1979); *Stinson v. Maxwell, Warden*, 2 Ohio St. 2d 228, 208 N.E.2d 132 (1965); *Schumm v. Nelson*, 659 P.2d 1389 (Colo. 1983). West's first assignment must therefore be overruled.

West's second claim of error in connection with the admissibility of the urine analysis is to the effect that a holder of a valid Class B permit is not authorized to perform a urine analysis, but is limited only to breath tests. Again, we believe West is in error. The evidence discloses that Officer DaMoude performed an analysis of West's urine with an Intoximeter Mark IV, using a technique enumerated in attachment 3-A5 to the rules promulgated by the state

Department of Health. While we are frank to concede that the rules, as promulgated, are not a paragon of clarity, we do believe that they authorize the holder of a valid Class B permit to perform a urine analysis. The following sections of the rules appear to be relevant in arriving at this conclusion:

(1) DEFINITIONS.

(a) Categories of permits issued by the Department of Health are:

. . . .

ii. CLASS B PERMIT, which means a permit to perform a chemical test to analyze a subject's blood, *urine*, or breath for alcohol content *by an approved method(s) with a specifically designed testing device(s).*

. . . .

(7) CLASS B PERMITS.

(a) QUALIFICATIONS FOR CLASS B PERMIT HOLDER. Class B permit holder qualifications for the chemical analyses of a subject's blood, *urine*, or breath for alcohol content by an approved method(s) with a specifically designed testing device(s) are:

. . . .

(d) LIST OF APPROVED DEVICES FOR CLASS B PERMITS.

i. Direct breath testing methods and devices, except preliminary breath testing devices, which are approved are listed below.

A. Gas chromatography analysis using the Intoximeter Mark II.

B. *Gas chromatography analysis using the Intoximeter Mark IV.*

C. Infrared absorption analysis using the Intoxilyzer Model 4011AS.

. . . .

(e) OPERATING RULES FOR CLASS B PERMIT. A Class B permit holder for the determination of alcohol content in blood, *urine* or

breath with a specifically designed testing device(s) shall:

i. Accept for test only the specimen types, i.e., blood, urine, or breath, which are listed on the permit;

ii. Be responsible for maintaining the legal continuity of all blood or urine specimens received;

. . . .

iv. Conduct blood or urine test runs with an inclusion of a quality control sample. . . .

. . . .

v. Make periodic reports of standard deviation data to the Department of Health as requested for tests of blood or urine . . . .

(Emphasis supplied.)

While at first reading it may appear that the devices listed in § (7)(d) are intended to be used only for direct breath testing methods, it is clear that such is not the case. The regulations promulgated by the state Department of Health recognize that the holder of a Class B permit may test not only for alcohol content in breath but in blood and urine as well, and the tester to do so may use an Intoximeter Mark IV. As the evidence reflects, the Intoximeter Mark IV will obviously determine the amount of alcohol content in an individual's urine. We are simply unable to reach any other conclusion except that, under the rules promulgated by the state Department of Health, the holder of a Class B permit may analyze an individual's urine with the use of gas chromatography analysis using the Intoximeter Mark IV, as was done in the instant case.

West next contends that the verdict as returned by the jury was unclear and ambiguous, thereby entitling him to a new trial. West was specifically charged with motor vehicle homicide in violation of § 28-306(1). This section makes it a crime for one to cause ''the death of another unintentionally while engaged in the operation of a motor vehicle in violation

of the law of the State of Nebraska." The laws which West was charged specifically with having violated, the violation of which unintentionally caused the death of another, were Neb. Rev. Stat. § 39-669.01 (Reissue 1978) and Neb. Rev. Stat. § 39-669.07 (Cum. Supp. 1982). To begin with, one may violate the provisions of § 39-669.07 in more than one way. This section may be violated if one operates or is in actual physical control of a motor vehicle "while under the influence of alcoholic liquor" or "when that person has ten-hundredths of one per cent or more by weight of alcohol in his or her body fluid as shown by chemical analysis of his or her blood, breath, or urine." Additionally, West could violate § 28-306(1) by violating § 39-669.01, which provides that "[a]ny person who drives any motor vehicle in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property shall be deemed to be guilty of reckless driving." The jury, therefore, could have found that West violated the provisions of § 28-306(1) in any one of three ways, either by operating a motor vehicle while under the influence of alcoholic liquor, or by operating a motor vehicle when he had ten-hundredths of one percent or more by weight of alcohol in his body fluid as shown by a urine analysis, or by operating his motor vehicle in a reckless manner. The commission of any one of those three acts, however, constituted but a single crime.

In the case of *Schluter v. State*, 153 Neb. 317, 44 N.W.2d 588 (1950), the defendant was charged with manslaughter in the operation of a motor vehicle. The information also set out the unlawful acts that the State claimed the defendant was guilty of at the time the death occurred. The defendant moved that the jury should, in the event of a verdict of guilty, specify the unlawful act upon which they relied. This court held that it was correct to overrule the request, on the ground that only a single offense was

charged. In *Schluter, supra* at 324, 44 N.W.2d at 593, we said:

> The claim of error and prejudice because of this is not well founded. It fails to distinguish between charging a person with separate offenses in one information, and rendering one general verdict on the separate offenses, and the situation in this case where only one offense is alleged in the information but there are several unlawful acts stated as one of the elements of that offense.

This is not a case in which a defendant is charged with multiple crimes in a single complaint but, rather, where the defendant is charged with a single crime which may be committed in a number of ways. Where one is charged with the commission of a crime which may be committed in a number of ways, a general verdict finding the defendant guilty of the crime charged is sufficient and is not ambiguous.

West next contends that he was denied his constitutional right to an impartial jury because members of the jury read a newspaper account, contained in the local newspaper, which was manifestly in error and prejudicial to him. It is, of course, unfortunate when newspapers fail to correctly and accurately report the facts. Nevertheless, we believe an examination of the record does not support the claim of prejudice. In order for jury misconduct to be the basis for a new trial, the misconduct must not only occur but it must be prejudicial to the defendant. *State v. Isley,* 195 Neb. 539, 239 N.W.2d 262 (1976). This rule applies to newspaper articles as well. In *State v. Bautista,* 193 Neb. 476, 478, 227 N.W.2d 835, 838 (1975), we said: "[I]n order for a verdict to be set aside because of prejudicial effect of newspaper accounts on jurors, there must be evidence presented that the jurors read newspaper accounts and that the accounts were unfair or prejudicial to the defendant." Therefore, not only must the defendant

in this case show that jurors in fact read the newspaper account but the defendant must also show that the accounts were unfair or prejudicial. Moreover, in any case, the determination as to whether misconduct was prejudicial is to be resolved by the trial court on the basis of an independent evaluation of all the circumstances in the case. *State v. Steinmark*, 201 Neb. 200, 266 N.W.2d 751 (1978). A motion for a new trial upon the grounds of jury misconduct is addressed to the sound discretion of the trial court, and a ruling made thereon will not be disturbed in the absence of an abuse of discretion. *State v. Robbins*, 207 Neb. 439, 299 N.W.2d 437 (1980).

The record discloses that the alleged misconduct occurred because of a newspaper article which appeared in the local paper the evening following the first day of trial. The article reported about evidence which had been introduced at the preliminary hearing but had not yet been introduced at the trial before the district court, and it informed the readers that the initial urine samples obtained from West showed "a 29.9 percent level of alcohol by weight, well above the 10 percent level considered proof of intoxication by law." Obviously, the decimal points in both numbers were in the wrong place. Although six jurors admitted to reading the article, the trial judge questioned the jurors on whether they could remain impartial. Following his examination, he concluded that they could be impartial. Further, the evidence which West maintains was prejudicial was in fact later introduced at trial, though the decimal points were put in the correct place. We do not believe that the evidence in this case shows that the newspaper article was prejudicial to the defendant nor denied him a fair and impartial trial. One would hope that such matters could be avoided and not be issues necessary to raise on appeal. Nevertheless, they do not entitle West to a new trial in this case.

West next contends that the trial court erred in

failing to give an instruction that he requested. The error concerns a requested addition to instruction No. 13 given by the trial court. The trial court gave instruction No. 13 as follows:

Evidence has been received by the Court that Defendant had .299 per cent by weight of alcohol in his body fluids as shown by a chemical analysis of his urine.

In determining the *weight* that this evidence is entitled to receive you should consider whether:

1. That the test was performed by an individual possessing a valid permit issued by the Department of Health for such purpose.

2. That the test was performed according to methods approved by the Department of Health.

3. That the testing device or equipment was in proper working order at the time the test was conducted.

4. That the test was conducted in compliance with all statutory requirements.

(Emphasis supplied.) This instruction, given by the trial court, was basically a verbatim instruction from, and at least tacitly approved by us in, the case of *State v. Brittain*, 212 Neb. 686, 325 N.W.2d 141 (1982). West contends, however, that the instruction did not go far enough; that the court should have given his requested instruction to the effect that there is a distinction to be made between methods used and techniques used and that failure to comply with the techniques also affects weight and credibility. See *State v. Miller*, 213 Neb. 274, 328 N.W.2d 769 (1983). On more careful analysis of this specific question, we now believe that the giving of the instruction of the type set out in *State v. Brittain*, *supra*, is not correct. The language contained in instruction No. 13 as given by the trial court states, in effect, the requirements of § 39-669.11. Such requirements for the admissibility of a urine specimen were first announced by us in *State v. Gerber*, 206 Neb. 75, 291 N.W.2d 403 (1980). That is, before it

may be determined that sufficient foundation has been laid for the admission into evidence of the results of the test, the requirements of *Gerber* must be met. Once the court, however, determines that the foundational requirements have been met and the evidence admitted, the jury has no function other than to determine the credibility and weight to be given the evidence. The jury is to consider the weight and credibility only of the test results, and not whether the foundational requirements necessary for admission of the tests were met. As a general rule, it is the province of the trial court in a jury case to determine the admissibility of the evidence offered by the parties at trial. See 75 Am. Jur. 2d *Trial* § 345 (1974). Neb. Rev. Stat. § 27-104(1) (Reissue 1979) specifically provides: "Preliminary questions concerning the . . . admissibility of evidence shall be determined by the judge . . . ." The court, and not the jury, is the arbitrator as to the admissibility of the evidence. See, *Garcia v. State*, 159 Neb. 571, 68 N.W.2d 151 (1955); *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 275 N.W.2d 77 (1979); *State v. Suggett*, 200 Neb. 693, 264 N.W.2d 876 (1978). The jurors are the judges of the credibility of the witnesses and of the weight to be given their testimony, once it is determined by the court that the evidence is admissible. *State v. Meadows*, 203 Neb. 197, 277 N.W.2d 707 (1979). Therefore, once the trial court determines that the *Gerber* tests have been met and that the evidence is admissible, it is not within the province of the jury to determine, as suggested by instruction No. 13, that the test was not performed by an individual possessing a valid permit issued by the state Department of Health for such purposes, or that the test was not performed according to methods approved by the state Department of Health, or that the testing device or equipment was not in proper working order at the time the test was conducted, or that the test was not conducted in compliance with all statutory require-

ments. The jury may only determine what weight to give the test in determining guilt or innocence. This is consistent with the general instruction given by the trial court to the jury that the jurors are the sole judges of the weight of the testimony and the credibility of the witnesses. In the instant case, West received an instruction far more favorable than he was entitled to receive, and the failure of the trial court to give the requested instruction was in no manner prejudicial, nor does it entitle West to a new trial. To the extent that our decisions in *State v. Brittain, supra,* and *State v. Miller, supra,* hold to the effect that an instruction such as that given here by the trial court in instruction No. 13 is either proper or required, they are modified.

The final error alleged by West is that the sentence imposed was excessive. Indeed, for a 19-year-old college student not previously guilty of any felony, a sentence of 30 months is a long and difficult sentence. Nevertheless, the crime here committed was of enormous proportion. One individual is dead and three others injured. And the saddest part of all is that all of it could have been avoided had West not been operating a motor vehicle in violation of the law. It was a senseless death, committed by a needless act. We have oftentimes said that in the absence of an abuse of discretion by the trial court, a sentence within the statutory limits will not be disturbed on appeal. See *State v. Foutch,* 196 Neb. 644, 244 N.W.2d 291 (1976). We cannot say, as a matter of law, that the trial court abused its discretion. For all of these reasons the conviction and sentence must be affirmed.

AFFIRMED.