[No. 36813.   Department Two.   April 23, 1964.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT OLIVER ERDMAN, *Appellant*.*

*Henry Opendack*, for appellant.

*Charles O. Carroll* and *Richard W. Pierson*, for respondent.

FINLEY, J.—Robert Erdman, the driver of an automobile involved in a head-on collision fatal to the other driver, is appealing from his conviction of negligent homicide by means of a motor vehicle. The only assignment of error relates to a chemical analysis of a sample of his blood used by the state to raise a presumption that he was under the influence of intoxicating liquor at the time of the accident. See RCW 46.56.010; *Seattle v. Bryan* (1958), 53 Wn. (2d) 321, 333 P. (2d) 680.

The sample of the defendant's blood was obtained, with his consent, at a hospital immediately following the accident. It was later tested for alcohol content by Mr. George Ishii, chief toxicologist of the King County Coroner's Office, and showed a reading of .27 per cent by weight. A reading of .15 per cent creates a presumption of intoxication.

*Reported in 391 P. (2d) 518.

Defendant objects to the use of the test on the ground that the prosecution failed to make a prima facie showing that the test was accurate. There is no dispute that the bottle used to keep the sample of the defendant's blood prior to testing by the toxicologist contained a small amount of white powder. Counsel for the defendant contends that this white powder (the identity of which was not *specifically* proved by the state with direct testimony) must be considered an unknown chemical of unknown properties, consequently making the test inadmissible.

█ The principle is well established that the state, in using as evidence any of the various chemical tests to determine the alcohol content of the blood, must present prima facie proof that both the test chemicals and the sample are free from adulteration which could conceivably introduce error into the results of the test. Thus, in *State v. Baker* (1960), 56 Wn. (2d) 846, 355 P. (2d) 806, the evidence of blood alcohol content obtained with a "breathalyzer" test was inadmissible because the state failed to present prima facie proof that no foreign substance had been present in the mouth of the subject. There, the defendant presented evidence that both toothache drops and cough medicine could have been present in his mouth in sufficient quantity to affect the test results.

In the present case the burden is likewise upon the state to present prima facie proof that the white powder could not have affected the test results. The testimony concerning the identity and effect of the powder was presented by Mr. Ishii, and is short enough to be set out in full significant detail as follows:

"Q Assuming there has been testimony that the bottle into which the blood was taken or placed was dry and there was also some white powder in the bottle, can you—does it matter to you, as far as the accuracy of the results of your test, what that powder was? A As long as it is not volatile and will not—the boiling point of it is less than 100 degrees centigrade. Q From your test were you able to determine whether or not there was any inaccuracies caused by the white powder being in the bottle? A I detected no inaccuracies. Q Have you in fact prepared these bottles

for use by law enforcement agencies? A I have in the past, yes.

"   .   .   .

"Q I am wondering generally when bottles such as this are prepared—and you said you have prepared such bottles —whether any sort of powder is placed in the bottle. A Yes, sir. Q What is that powder?

"   .   .   .

"A There are various powders that can be added. In the King County Coroner's Office and also in the Seattle police office, where I instituted this procedure, we use sodium fluoride. Q Is that white powder? A Yes, sir."

A substantially identical case is *State v. Kindschuh* (1957), 248 Ia. 440, 80 N.W. (2d) 750, where the defendant was also complaining that the bottle in which a sample of his blood was placed contained an "unknown" white powder which might render the test inaccurate. The Iowa Court held that testimony that potassium oxalate, a white powder also used as an anticoagulate, was "routinely placed" in the containers was sufficient as identification of the chemical when the defendant produced no evidence to the contrary. While the doctor in that case was unable to testify from his own knowledge that the substance was potassium oxalate, he did certify that it "looked and acted like the substance we always used."

In the present case the testimony that the general practice was to place sodium fluoride in all bottles prepared for blood samples, coupled with the testimony of the chief toxicologist that no inaccuracies were detected, constituted prima facie proof as to the identity of the powder and the consequent accurracy of the blood-alcohol test. With this established, some burden must be placed upon the defendant to come forward with some proof, evidence or indication that impugns the accuracy of the test. In this connection it should be noted that the defendant did not so much as object to the admission of the sample in evidence, even though he knew of the white powder well before trial. Nor did he so much as suggest what else the chemical might be.

The motion to strike the evidence was properly overruled, and the conviction is affirmed.

OTT, C. J., DONWORTH, WEAVER, and HAMILTON, JJ., concur.

June 12, 1964. Petition for rehearing denied.