[No. 54009–8.   En Banc.   June 2, 1988.]

THE STATE OF WASHINGTON, *Petitioner,* v. BRET
FORD, *Respondent.*

*Norm Maleng, Prosecuting Attorney, Stephen E. Moore, Senior Deputy,* and *Susan J. Noonan* and *Carol Spoor, Deputies,* for petitioner.

*Wolfe, Lobsenz & Cullen,* by *James E. Lobsenz* and *Paul A. Cullen,* for respondent.

*Douglas N. Jewett, City Attorney,* and *Douglas B. Whalley, Assistant,* amici curiae for petitioner.

*Catherine Miller* and *Molly Cohan* of *Seattle–King County Public Defender Association; Douglas L. Cowan, Stephen W. Hayne,* and *Jon Scott Fox,* amici curiae for respondent.

BRACHTENBACH, J.—This case concerns the validity of the approval by the state toxicologist of a device to measure breath alcohol content. That measuring device is known as a BAC Verifier DataMaster machine (DataMaster). This defendant, charged with driving while intoxicated, along with similarly charged defendants in other pending cases, moved to suppress the test results, each of which indicated a breath alcohol content violative of RCW 46.61.502. A number of cases were consolidated; a hearing on the suppression challenge to DataMaster results was held in the Bellevue District Court of Judge Joel A.C. Rindal.

Judge Rindal denied the motion to suppress. Defendant appealed to superior court pursuant to the Rules for Appeal of Decisions of Courts of Limited Jurisdiction. The Superior Court reversed. We granted discretionary review and reverse the Superior Court.

While this case has great significance in the use of the breath alcohol testing devices in use by law enforcement throughout the state, the legal principles upon which the decision rests are well established.

The legal principles involved are summarized as follows: First, the Legislature has validly delegated to the state toxicologist the authority to approve methods of analysis of a person's blood or breath to determine alcohol content. Second, the courts have inherent power to review the toxicologist's approval to assure that his exercise of his delegated authority is not exercised in an arbitrary and capricious manner. Third, the review on appeal, here and in the superior court, is governed by the RALJ standards contained in RALJ 9.1.

We review these principles in more detail, starting with the delegation of authority.

The Legislature has defined the crime of driving under the influence of intoxicating liquor as driving while a person has a specifically stated breath or blood alcohol content. RCW 46.61.502(1), (2). The determination of that content is by an analysis of breath or blood authorized by RCW 46.61.506. To be valid an analysis of breath or blood "shall have been performed according to methods approved by the state toxicologist". RCW 46.61.506(3). The whole scheme of the crime of driving while intoxicated has withstood numerous challenges. *State v. Franco,* 96 Wn.2d 816, 639 P.2d 1320 (1982); *State v. Baker,* 56 Wn.2d 846, 355 P.2d 806 (1960); *State v. Erdman,* 64 Wn.2d 286, 391 P.2d 518 (1964); *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978). Particularly instructive on a constitutional challenge is *State v. Melcher,* 33 Wn. App. 357, 655 P.2d 1169 (1982).

We note that this case is not a contested case within the purview of the administrative procedure act, RCW 34.04, but that the statutory procedures therein provide an analogous methodology of review. In any event, the courts have inherent power to review an administrative action to assure that it was not arbitrary and capricious. *Pierce Cy. Sheriff v. Civil Serv. Comm'n,* 98 Wn.2d 690, 694, 658 P.2d 648 (1983).

Finally, on review of the decision of the district court, the superior court determines whether that court has committed any error of law. RALJ 9.1(a). Consistent with any

appellate review of factual findings of a trial court, however, the reviewing court

shall accept those factual determinations [of the district court] supported by substantial evidence in the record (1) which were expressly made by the court of limited jurisdiction, or (2) that may reasonably be inferred from the judgment of the court of limited jurisdiction.

RALJ 9.1(b).

■ The key issue is whether the state toxicologist's approval by regulation of the DataMaster was arbitrary and capricious. We first need some standard by which to determine whether this action is arbitrary and capricious. The oft–repeated definition is "'"willful and unreasoning action in disregard of facts and circumstances."'" *UPS, Inc. v. Department of Rev.*, 102 Wn.2d 355, 365, 687 P.2d 186 (1984), quoting *Skagit Cy. v. Department of Ecology*, 93 Wn.2d 742, 749, 613 P.2d 115 (1980). That phrase is traceable to *Sweitzer v. Industrial Ins. Comm'n*, 116 Wash. 398, 401, 199 P. 724 (1921). The *Sweitzer* discussion is more expansive than the generally stated rule. The relevant language is:

The most that can be said of their [the agency] action, even from the respondent's point of view, is that they erred in judgment. But this is not arbitrary or capricious action. These terms, when used in this connection, must mean wilful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case. Action is not arbitrary or capricious when exercised honestly and upon due consideration where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached.

*Sweitzer*, at 401.

From this language several principles are distilled. First, an error in judgment is not arbitrary and capricious. A judicial conclusion that the administrative decision was erroneous is not sufficient. Second, the action essentially must be in disregard of the facts and circumstances

involved. Third, the court necessarily looks to the facts before the administrative agency.

From these generalities we must determine whether our review is an examination of a question of law or a question of fact. If we are reviewing a question of fact, our duty is simply to accept factual determinations made by the trial court which are supported by substantial evidence. RALJ 9.1(b).

The defendant contends that appellate review is of a question of law and therefore de novo. We disagree. Judicial review of administrative action may indeed pose a question of law. For example, an agency rule must stem from an express or necessarily implied statutory grant of authority, *i.e.,* delegation. The court reviews such rules to ascertain statutory authority and a reasonable consistency with the statute being implemented. *Green River Comm'ty College v. Higher Educ. Personnel Bd.,* 95 Wn.2d 108, 112, 622 P.2d 826, *adhered to and modified,* 95 Wn.2d 962, 633 P.2d 1324 (1980). Generally, such questions will be a matter of law.

Here, however, we are concerned with the actions of the state toxicologist. We are not determining whether he acted beyond his authority, but rather whether he acted in disregard of the facts and circumstances before him. The very nature of the inquiry is what the toxicologist did, what facts he relied upon, whether he acted without any rational relation to the facts before him. Conclusions about the action of the toxicologist are based upon what he did or did not do. These are events, occurrences, realities as to what took place. They are facts. *Grimwood v. University of Puget Sound, Inc.,* 110 Wn.2d 355, 753 P.2d 517 (1988).

To review the act of the toxicologist de novo would tend to substitute judicial judgment for an administrative decision. That we are not permitted to do. Indeed, when the rule (which we deem the toxicologist's action to be) is authorized and consistent with the authorizing statute, the

rule is presumed valid; the one attacking it has the burden of overcoming that presumption. *Weyerhaeuser Co. v. Department of Ecology,* 86 Wn.2d 310, 314, 545 P.2d 5 (1976). Historically, in similar contexts, this court has emphasized its *review of the record* to judge conduct alleged to be arbitrary and capricious. *See, e.g., Morgan v. Department of Social Sec.,* 14 Wn.2d 156, 185, 127 P.2d 686 (1942); *Robinson v. Olzendam,* 38 Wn.2d 30, 37, 227 P.2d 732 (1951).

In approaching this review, we are favorably impressed by the remarks in *Natural Resources Defense Coun., Inc. v. SEC,* 606 F.2d 1031, 1050 (D.C. Cir. 1979):

> In short, the concept of "arbitrary and capricious" review defies generalized application and demands, instead, close attention to the nature of the particular problem faced by the agency. The stringency of our review, in a given case, depends upon analysis of a number of factors, including the intent of Congress, as expressed in the relevant statutes, particularly the agency's enabling statute; the needs, expertise, and impartiality of the agency as regards the issue presented; and the ability of the court effectively to evaluate the questions posed. Only through such a flexible approach can we review the multifarious types of agency actions as responsible participants in an enterprise of practical governance.

(Footnotes omitted.)

Thus, as we turn to the record here, we are mindful that it is not our function to substitute our judgment for that of the state toxicologist, nor was such the function of the trial judge. An unwise or even erroneous decision arrived at pursuant to the legislative duty delegated, upon facts which motivated a rational decision, is not arbitrary and capricious. That the toxicologist might have used a methodology more precise or might have used a different procedure of evaluation reflects upon his administrative judgment, but does not make his action arbitrary and capricious.

Before embarking upon a review of the record to determine whether substantial evidence supports the stated or reasonably inferred factual determinations of the District

Court, we put in context the decision of Judge Rindal. He heard testimony and arguments for 2 full days, the last day's hearing ending at 10:15 p.m. He issued a 33–page opinion which demonstrates a thorough understanding of the scientific principles involved in the design and operation of the DataMaster. The evidence before Judge Rindal comprises 600 pages of testimony and 41 exhibits. The opinion accurately summarizes and rejects the six grounds raised by the defendants' motion to suppress.

In applying our narrow and limited scope of review to the decision of the District Court, we must remember that the Legislature has mandated that the analysis of breath or blood is valid if it is performed "*according to methods approved by the state toxicologist*". RCW 46.61-.506(3). The ultimate concern of the judiciary is that the methods approved result in an accurate test, competently administered, so that a defendant is assured that the test results do in fact reflect a reliable and accurate measure of his or her breath content. We are satisfied that this ultimate goal is reached here as reflected by Judge Rindal's conclusion:

> In the instant case, although there was substantial and persuasive evidence that the rules, at the time of adoption were without scientific basis, no witness testified that the DataMasters in the field were not producing accurate and precise results and to the contrary, Sergeant Gullberg testified that the results of the evaluation and certification tests performed on each instrument before it was placed in the field, convinced him that the test results from those instruments were accurate and precise.

Opinion of Judge Rindal, Bellevue District Court, at 30–31 (June 10, 1986).

In reviewing the record it is helpful to summarize the steps taken which led to approval of the DataMaster:

1. In 1983 an ad hoc committee was formed to evaluate the use of an infrared method of breath testing replacing the "Breathalyzer" previously in use for many years. *State v. Baker*, 56 Wn.2d 846, 355 P.2d 806 (1960). The committee included the state toxicologist and Sergeant Gullberg,

the State Patrol administrator of the breath test program, and a qualified expert.

2. Ultimately, infrared devices were submitted by four manufacturers including a BAC Verifier, the manufacturer of which eventually produced the DataMaster.

3. The various machines were tested by the State Patrol from September 1983 to April 1984.

4. In June 1984 bid specifications were prepared to meet criteria set by the toxicologist and State Patrol.

5. Contract awarded to manufacturer which produced the Verifier, ultimately called DataMaster.

6. On March 26, 1985, the toxicologist adopted WAC 448-12-210, which approved the BAC Verifier DataMaster infrared breath test instrument. WAC 448-12-220 through 448-12-340 defined the test to be used, methodology, and operator's qualifications.

7. The DataMaster was tested by the State Patrol from April 1985 to January 1986. It was not then in use in the field, at least until December 1985.

8. The toxicologist adopted an emergency rule on December 16, 1985, the main purpose of which was to provide for a more accurate test of the breath sample. WAC 448-12-210 through 448-12-340.

9. The toxicologist adopted nonemergency rules to amend March 1985 rules, again approving the DataMaster device, establishing test definition, procedures, etc.

10. Defendant was cited on March 8, 1986.

The main thrust of the defendant's challenge is that the DataMaster in use in the field, and used on this defendant, did not exist when the March 1985 WAC approval was made. Second, the defendant points to 17 changes from the test machine and the DataMaster in use. The Superior Court relied upon these two points to reverse the District Court. These challenges have superficial attraction, but close examination of the procedures employed dispels their appeal.

The scientific principles of infrared spectroscopy upon which these machines operate are established and accepted. The four devices submitted for testing, including the BAC Verifier, were based upon those principles.

The toxicologist created the written testing protocol to be used in the testing and evaluation of the four machines. The toxicologist reviewed and relied upon the testing and evaluation data before approving the DataMaster. Blood/breath correlations were done prior to approval. The toxicologist's opinion was that all four machines produced satisfactory results.

Following substantial testing of the four machines, bid specifications were prepared and reviewed by the toxicologist. While none of the tested machines would have met perfectly the bid specifications, the bid specifications set the criteria for machines to be furnished, all relating to an analysis and performance based upon the same scientific principles. The toxicologist considered the DataMaster to be the same type machine despite some differences in components, but which met the bid specifications. The differences between the Verifier and the DataMaster were not of importance to the toxicologist because both were still measuring alcohol in the same way.

Highly significant and compelling is the toxicologist's instruction that before "any instrument [DataMaster] is placed into the service [in the field for actual use], they have to be reevaluated, certified and blood/breath correlations repeated." Transcript of Proceedings, at 184. Further, "every instrument [DataMaster] before it's placed in the field should be evaluated for precision, accuracy—for precision and accuracy." Transcript of Proceedings, at 186.

Before December 1985 WAC approval of the DataMaster, additional tests were done with results comparable to the original BAC Verifier. The toxicologist concluded, before the DataMaster was ever put to actual use, that the instruments were accurate and precise. Transcript of Proceedings, at 216.

Sergeant Gullberg conducted or supervised most of the tests on the initial machines and the DataMaster. He testified that in addition to tests conducted at the direction of the toxicologist, the National Highway Traffic Safety Administration, in July 1985, tested the DataMaster. The nature of the tests and the results were published. The DataMaster met the federal standards and was placed on an approved products list. That evaluation was relied upon in part by Sergeant Gullberg in his evaluation of the Data-Master. It was Sergeant Gullberg's opinion that the Data-Master was a reliable, accurate and precise instrument for its intended purpose. Report of Proceedings, at 528.

Much emphasis is placed upon changes between the test machine and the one in use. Such changes could be significant, but no testimonial record was made of the significance of those changes. Defendant notes the existence of 17 changes, as did Judge Rindal, but defendant offers no evidence of the significance of those changes. For example, there is a difference in circuitry and a difference in radio frequency interference antennas. These changes do not overcome the positive expert opinions as to the accurate and precise performance of the DataMaster which tested defendant.

It may well have been premature for the toxicologist to issue his March 1985 approval before the ultimate machine was at hand. However, before the DataMaster was applied to defendant Ford, it had been tested, retested and certified. The toxicologist, to whose satisfaction the device must perform according to legislative mandate, issued a new WAC again approving the DataMaster. This occurred more than 3 months before defendant was cited.

In summary, there is nothing in the record to suggest that the DataMaster produced an inaccurate result when its test was administered to defendant Ford. There was no witness who testified that the DataMasters in actual use, after final approval by the toxicologist, were not producing accurate and precise results.

There was substantial evidence to support the factual determinations made by the District Court; the judge committed no error of law. Therefore, the Superior Court is reversed.

PEARSON, C.J., UTTER, DOLLIVER, DORE, CALLOW, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.

PEARSON, C.J.—By order of the court, SAR 14 has been suspended for purposes of this appeal and the dissent to this opinion will be filed at a later date.

[En Banc.      June 30, 1988.]

GOODLOE, J. (dissenting)—The majority bases its decision solely on the state toxicologist's and Sergeant Gullberg's assertion that the DataMaster produces an accurate and reliable result. Since there is not substantial evidence to support the finding that the DataMaster produces such a result, I dissent.

I

The majority is correct that the standard of review of the district court decision is governed by RALJ 9.1, which states in part:

(a) **Errors of Law.** The superior court shall review the decision of the court of limited jurisdiction to determine whether that court has committed any errors of law.

(b) **Factual Determinations.** The superior court shall accept those *factual determinations supported by substantial evidence in the record* (1) which were expressly made by the court of limited jurisdiction, or (2) that may reasonably be inferred from the judgment of the court of limited jurisdiction.

(Italics mine.) RALJ 9.1(b) comports with the substantial evidence rule that the Court of Appeals applies when reviewing a superior court judgment. 4A L. Orland, Wash. Prac., *Rules Practice* § 7731, at 541 (3d ed. 1983). "Substantial evidence exists if the record contains evidence of

sufficient quantity to persuade a fair–minded, rational person of the truth of the declared premise." *Bering v. Share,* 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed,* 479 U.S. 1050, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987).

In the present case, the District Court made no express findings of fact. Thus, this court is bound only to accept those findings of fact that may reasonably be inferred from the district court judgment.

The majority concludes that the District Court made the inferred finding that the DataMaster produces an accurate and reliable result, and asserts that this finding is based on substantial evidence. However, one only needs to read the record to realize that there is not substantial evidence to support such an inferred finding.

Interestingly, the majority never discusses the evidence which it contends supports its position that the DataMaster produces an accurate and reliable result except for the state toxicologist's and Sergeant Gullberg's assertion that it does. Rather, the majority improperly turns this evidentiary question around by asserting that "there is nothing in the record to suggest that the DataMaster produced an inaccurate result when its test was administered to defendant Ford." Majority opinion, at 836. *This statement is simply not correct.*

Sergeant Gullberg's testimony alone raises concerns whether the DataMaster produces an accurate and reliable result. Sergeant Gullberg testified:

1. Some DataMasters detected acetone during testing, although the simulator solution was simply alcohol and water. The cause for this misreading was never discovered.

2. The DataMaster fails to detect acetaldehyde as a compound other than ethyl alcohol although the bid specifications require it to detect interferents. (Acetaldehyde is used to make perfumes and drugs.)

3. The State Patrol concluded that using a pump rather than having the individual blow into the instrument was the proper method to calibrate the DataMaster, despite the fact that the manufacturer Verax recommended the latter

method. Test results run on the DataMaster gave different results depending on the calibration method used. The reason for this disparity was never found. Gullberg testified that he did not know which method was more scientifically accurate.

4. The DataMaster gave false interferent readings with an acetone solution when the machine was calibrated for a .10 acetone exclusion (Verax originally recommended that the DataMaster be calibrated at this level). No tests were ever run to determine the cause of this problem. Instead, the State Patrol decided to calibrate the machine with an approximately .03 exclusion, because at this level the machine did not give false interferent readings.

5. In some cases, interferents were detected in one sample but not the other (two identical samples are run on each individual as a check against each other). The source of this problem was never discovered. However, the state toxicologist solved this problem by ordering that the interferent threshold level be raised from .005 to .01. This means any interferent between .0 and .009 will not trigger the interferent detection device.

6. Other DataMaster problems included difficulties with the printer, simulator pump, and calibration factor. Also, the microprocessor locked up in the review mode, and the system would not zero.

Time and time again, the State Patrol, with the state toxicologist's approval, adjusted away problems because neither the State Patrol nor Verax could determine the source of those problems. Such methodology raises doubts whether the DataMaster produces an accurate and reliable result.

The State Patrol was apparently concerned about the numerous problems it encountered while testing the Data-Master. In about May 1985, the State Patrol considered terminating the DataMaster contract. A committee met to discuss such a termination. Interestingly, the State Patrol did not inform the state toxicologist until sometime later that it had considered terminating the contract.

The state toxicologist's testimony raises further concerns about whether the DataMaster produces an accurate and reliable result. He testified that he approved the DataMaster because he believed the Verifier, its predecessor, was reliable based on the initial tests run on it. Nevertheless, the state toxicologist admitted the following during his testimony:

1. He acknowledged that prior to the time the committee was formed to discuss adopting an infrared testing device, neither he nor the State Patrol had any familiarity with infrared breath alcohol testing.

2. He knew that the Verifier failed 55 percent of test levels in the evaluation procedures for both accuracy and precision. He also knew that the Verifier failed the initial evaluation tests and its performance would have failed to pass bid specifications at 18 out of 20 levels for both accuracy and precision. Further, the evaluation tests provided no information on the Verifier's ability to detect interferents isopropanol and methanol because of instrument failure.

3. He did not consider Sergeant Gullberg's opinion when selecting the device. Sergeant Gullberg recommended that the State choose the Intoxilyzer 5000 over the Verifier and other instruments.

4. He considered the Verifier and the DataMaster virtually identical, although Sergeant Gullberg considered the DataMaster an entirely new instrument. He reached this conclusion because he felt that "the [DataMaster] was still measuring alcohol the same way." Report of Proceedings, at 164. However, he then conceded that no data existed to support this conclusion.

Decisionmaking is arbitrary and capricious if it is willful and unreasoning action ignoring the facts and circumstances. *Micone v. Steilacoom Civil Serv. Comm'n,* 44 Wn. App. 636, 722 P.2d 1369, *review denied,* 107 Wn.2d 1010 (1986); *UPS, Inc. v. Department of Rev.,* 102 Wn.2d 355, 687 P.2d 186 (1984). In the present case, the state

toxicologist's actions make no sense. It is apparent that he made his questionable selection of the Verifier and then stayed with that choice no matter what happened. In other words, he acted arbitrarily and capriciously.

Furthermore, the DataMaster was not fully tested under the bid specification requirements, so there is a lack of data to study to ascertain whether the DataMaster produces accurate and precise results.

Sergeant Gullberg admits that the bid specifications were prepared with the intention that the infrared device used in the state would conform to each specification. Nevertheless, the DataMaster was never tested to determine if it met all of the bid specifications. Sergeant Gullberg's testimony regarding bid specification included the following:

1. The bid specifications required the machine to detect interferents. The DataMaster reads acetaldehyde as alcohol.

2. The bid specifications required the machine to have the capability for detecting mouth alcohol. Although Sergeant Gullberg thinks that the DataMaster was tested for mouth alcohol detection, no such results were recorded.

3. The bid specifications required that the machine operate despite "power spikes", sudden surges of electrical power. The DataMaster was never tested to see what effect a "power spike" would have on it.

4. The bid specifications required that the machine operate under varying environmental conditions: humidity—0 to 100 percent; ambient temperature—20 to 120 degrees Fahrenheit; barometric pressure—21 to 32 inches of mercury; and altitude—0 to 6,000 feet. Tests were never run on the DataMaster to see whether it operated within these parameters.

The bid specifications were designed for a purpose. Despite this, many bid specifications were ignored and the State Patrol did not determine if the DataMaster met them.

There is no evidence in the record to support the inferred finding that the DataMaster produces an accurate and reliable result. Thus, the majority asserts that substantial evidence exists, but does not point out specifically the evidence to which it refers. In reality, the proper conclusion is that the DataMaster probably does not produce an accurate and reliable result.

## II

My other disagreement with the majority is that it fails to address a key issue in determining if DataMaster results should be admissible. Normally, this court follows the standard set out in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), when ruling on the admissibility of testimony based on scientific procedures or theories. *See State v. Black,* 109 Wn.2d 336, 745 P.2d 12 (1987) ("rape trauma syndrome" evidence inadmissible); *State v. Martin,* 101 Wn.2d 713, 684 P.2d 651 (1984) (hypnosis evidence inadmissible); *State v. Allery,* 101 Wn.2d 591, 682 P.2d 312 (1984) ("battered woman syndrome" evidence admissible); *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978) (retesting of used Breathalyzer ampuls inadmissible); *State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1974) (polygraph evidence inadmissible); *State v. Huynh,* 49 Wn. App. 192, 742 P.2d 160 (1987) (gas chromatography evidence inadmissible), *review denied,* 109 Wn.2d 1024 (1988); *Burkett v. Northern,* 43 Wn. App. 143, 715 P.2d 1159 (thermography evidence inadmissible), *review denied,* 106 Wn.2d 1008 (1986); *Seattle v. Peterson,* 39 Wn. App. 524, 693 P.2d 757 (1985) (radar evidence inadmissible); *State v. Mulder,* 29 Wn. App. 513, 629 P.2d 462 (1981) ("battered child syndrome" evidence admissible).

The *Frye* standard states that before results from a scientific test are admissible, there must be a showing that the test has been generally accepted as reliable by the relevant scientific community. *Peterson,* at 527. Furthermore, the *Peterson* court, at page 527, held that

[t]he inquiry is as to the reliability of the machine itself. If the validity of a scientific principle is a prerequisite to its admission into evidence, then consistency requires that *evidence of the ability of a machine to employ that scientific principle reliably must also precede admission of the machine's results into evidence.*

(Italics mine.) The *Peterson* holding finds support with scholarly opinion and many other jurisdictions. One expert commented that

in many jurisdictions subscribing to *Frye,* the proponent must prove that the instrument, like the theory, has gained general acceptance in relevant scientific circles. These jurisdictions apply *Frye* to both the instrument and the theory.

(Footnote omitted). E. Imwinkelried, *Scientific and Expert Evidence* 49 (2d ed. 1981).

In the present case, all the parties agree that the scientific principle of infrared technology upon which the Data-Master operates has been established and accepted by the scientific community. However, nowhere in the district court opinion does it address whether the DataMaster, the machine itself, has been accepted as reliable in the scientific community. Rather, the District Court Judge, in his opinion, states:

It seems to this writer that *Canady* [*sic*] [and its reliance on *Frye*] may *only* be here significant because, on the narrow issue before that court as to whether the government should be required to retain the "test ampoules" for later retesting, the state toxicologist was silent.

Opinion of Judge Rindal, Bellevue District Court, June 10, 1986, at 27. It is clear that Judge Rindal did not grasp the significance of the *Frye* standard; otherwise, he would have applied the test to the present situation.

Similarly, the majority fails to discuss the *Frye* test. Why? I can only assume that the majority did not address *Frye* because then the majority could not have come out with its result.

The sole expert on infrared technology who testified was Dr. Richard E. Jensen, a Ph.D. from the University of Iowa

in the field of analytical chemistry. He was involved in Minnesota's selection and evaluation of infrared breath test devices.

Dr. Jensen testified that he had reviewed the state toxicologist's deposition, listened to Sergeant Gullberg's testimony, and reviewed all the documents referred to by Gullberg.

Dr. Jensen then testified that there was *no basis to draw any scientific conclusion as to the DataMaster's accuracy and reliability.* He concluded by stating that, even at the present time, the evidence did not support a scientific finding that the DataMaster was an accurate and reliable device for the purpose intended. He reached his conclusion based in part on the following:

1. The initial tests were run on a device (the Verifier) that significantly differed from the device (the DataMaster) proposed to be used in the field; therefore, from a scientific viewpoint, measurements made on the Verifier have no bearing on what was used in the field.

2. The Verifier failed most of the tests that were proposed to be used as criteria.

3. There is a marked lack of data indicating that the DataMaster produces an accurate and reliable result. Although Sergeant Gullberg testified to unrecorded data, scientific theory requires that data be recorded so that it can be evaluated.

4. There is a gross difference in the two methods of calibration (pump or blow) used on the DataMaster. The high disparity in results between the two methods indicates that "you can't measure accurately." Report of Proceedings, at 609.

It is clear why the majority chose to ignore Dr. Jensen's testimony. The DataMaster has not been accepted by the scientific community as producing reliable results. Therefore, the *Frye* standard for admissibility has not been met; test results run on the DataMaster should not be admissible.

## III

The majority has approved the DataMaster despite any evidence that it produces an accurate and reliable result. Perhaps the problems with the DataMaster can be worked out. But unless they are, there is no guaranty that an individual given a test on the DataMaster will get an accurate and reliable reading. Therefore, I dissent.

Reconsideration denied July 20, 1988.