[No. 30196-9-I. Division One. January 10, 1994.]

NORQUEST/RCA-W BITTER LAKE PARTNERSHIP, ET AL,
*Respondents,* v. THE CITY OF SEATTLE,
*Appellant.*

*Mark H. Sidran, City Attorney,* and *Patrick Schneider, Assistant,* for appellant.

*Robert D. Johns, Joseph P. McCarthy, William R. Hickman,* and *Reed McClure,* for respondents.

COLEMAN, J. — The City of Seattle appeals three different rulings. In the first ruling, Judge Carol Schapira granted Norquest-RCA's motion for a writ of mandamus, finding that the City's refusal to issue a building permit was arbitrary and capricious. In the second ruling, Judge Joan E. DuBuque granted Norquest-RCA's motion to strike Alan Bennett as a witness, finding that the City had identified the witness after the discovery cutoff date. In the third ruling, Judge Edward Heavey ruled in favor of Norquest-RCA at trial, finding the City liable for delay damages under RCW 64.40 and 42 U.S.C. § 1983 and for the tort of wrongful interference with business relations. The City appeals all three rulings as well as two attorney fee awards in favor of Norquest-RCA by Judges Schapira and Heavey. Norquest-RCA cross-appeals Judge Heavey's award of interest costs. We affirm in part and reverse in part.

The origin of this dispute begins with the Seattle zoning code, which classifies particular institutions as "major institutions".[1] SMC 23.48.002(A). Under the code, a major insti-

---

[1]The code identifies "major institutions" by name only. It does not define the term or provide any standards for determining whether an affiliated entity is an expansion of the named major institution.

tution is subject to special zoning standards, one of which provides that it may only expand its facilities within 1 mile of its campus pursuant to an approved master plan.[2] The director of Seattle's Department of Construction and Land Use (DCLU) is required to evaluate whether a major institution's proposed development requires a master plan. If so, the master plan process is complex and generally takes 3 or more years to complete.

Northwest Hospital operates an acute care hospital in north Seattle and is designated as a major institution under the code. Northwest Hospital is a corporate relative of Norquest Healthcare Corp. (Norquest). Norquest operates nursing care businesses in King and Snohomish Counties. The two corporations are related by the following series of relationships: Norquest is a wholly owned subsidiary of Pacific Consolidated Services Corp. (PCSC); PCSC is a wholly owned subsidiary of Health Resources Northwest; Health Resources Northwest, in turn, is the parent corporation of Northwest Hospital. Among these related corporations, there is some overlap of officers.

In early 1985, PCSC and Norquest became interested in establishing an adolescent drug treatment center. After soliciting potential development partners, Norquest began negotiating with Recovery Centers of America-Western (RCA) to develop and operate the proposed center. RCA is a California company unrelated to the other entities, and it operates 33 drug and alcohol treatment facilities around the country under the name "New Beginnings".

In 1986, RCA agreed to open a treatment center in a space to be provided by Norquest. After investigating various sites, RCA and Norquest chose a piece of property near Bitter Lake in Seattle, which was located two-thirds of a mile from Northwest Hospital.

In 1987, Norquest executed an agreement to purchase the Bitter Lake site. The sale was contingent on approval of all permits needed for RCA's treatment center. Norquest and RCA agreed that if RCA obtained the permits, Norquest

---

[2]A March 1990 amendment to the code reduced the radius to one-half mile.

would close the land purchase, renovate an existing building, and lease it to RCA. The agreement also provided that RCA would have sole responsibility for the management and operation of the facility.

Before applying for a conditional use permit, RCA's attorney, Brent Carson, arranged for a preapplication conference with DCLU staff member John Doan and Alan Bennett, an engineer for the Seattle Department of Engineering (SED). The purpose of the meeting was to determine whether Norquest's relationship to Northwest Hospital through PCSC and Health Resources would trigger the requirements of the master plan process.

At the meeting, Carson described the corporate relationship between Norquest, PCSC, Health Resources, and Northwest Hospital. He then explained that Norquest would purchase the property and lease it to RCA and that RCA would have sole authority to operate the treatment facility. Carson also stated during the meeting that if a master plan were required, the applicants would not proceed with the development of the property. Carson provided DCLU with all of the information that it requested.

After the meeting, Doan consulted with senior management of DCLU and an attorney in DCLU's code interpretation section concerning the master plan issue of the proposed project. After consultation and discussion based on the information provided by Carson, DCLU concluded that the proposed project was not sufficiently related to Northwest Hospital and that completion of a master plan for Northwest Hospital would not be required prior to issuance of permits for the treatment facility.

Doan telephoned Carson with the decision and, based on the information that the 1-mile rule did not apply, RCA applied for a conditional use permit. The City issued the permit in October 1987. After winning an appeal brought by a neighborhood citizen group opposed to the treatment facility, Norquest waived the remaining permitting contingencies in the Norquest-RCA contract.

Because of increased project costs, RCA and Norquest subsequently entered into the Norquest/RCA-W Bitter Lake Partnership (Partnership). Under the Partnership agreement, RCA agreed to contribute funds in exchange for an interest in the site. Norquest then assigned its interest in the site to the Partnership, which replaced Norquest as RCA's landlord. The Partnership agreement changed Norquest from a 100 percent owner of the site to a 70 percent owner. Norquest and RCA did not notify DCLU of their change in relationship.

In December 1988, after closing the purchase of the site, the Partnership applied for a building permit to renovate the building. As part of the permitting process, the building plans were routed to SED in order to review the drainage plans. Norquest took out a $2.4 million construction loan in April 1989 to finance the renovation.

During the processing of the building permit, neighborhood residents renewed their opposition to the treatment center. They sent information about the Partnership to DCLU and contacted the Seattle City Council, the Citizen's Service Bureau, and the Legislature.

In June 1989, Doan informed Norquest and RCA that the City was reconsidering whether RCA's treatment center needed to be included in Northwest Hospital's master plan. Although the City had previously told Norquest and RCA that the building permit was ready to be issued, Doan explained that it would withhold the permit pending its decision. Norquest and RCA turned over all of the information requested by the City.

In its reconsideration, the City reviewed two pieces of information provided by the neighborhood residents: (1) a check written by Northwest Hospital for a conditional use permit fee and (2) a Yellow Pages advertisement for the treatment facility, which identified the facility as "New Beginnings of Northwest" and which was located next to another RCA facility advertisement, "New Beginnings at Lakewood Hospital". As to the check, the Partnership explained that it

was written in error; an employee of PCSC, which provides accounting services to both Northwest Hospital and Norquest, mistakenly issued a Northwest Hospital check. After discovering the mistake, RCA reimbursed Northwest Hospital. As to the advertisement, RCA, which was solely responsible for placing the ad, stated that it chose the name to refer to the geographical Northwest. The name "New Beginnings", which RCA used to identify its other facilities around the country, could not be used in Seattle because that name had already been taken by a battered women's shelter.

The City also obtained a copy of the Bitter Lake Partnership agreement and a list of the officers of Northwest Hospital. The agreement stated that the purpose of the agreement was to "acquire, develop, construct, lease and operate for investment a building on the Property", and it designated Norquest as the managing partner. The list of officers and corporate owners indicated that there were officers and directors that overlapped between the various corporations.

On August 4, 1989, the City notified Norquest and RCA that it would not issue the building permit until RCA's treatment center was included in an approved master plan for Northwest Hospital. The Partnership responded by suing for a writ of mandamus to compel issuance of the building permit and for damages due to the delay in issuing the permit.

On November 21, 1989, Judge Schapira granted the petition for a writ of mandamus, concluding that DCLU's decision to require the master plan was arbitrary and capricious. The court ordered DCLU to issue the permit by December 13, 1989. Trial on the damages claim was set for July 22, 1991.

Meanwhile, in July 1989, about 1 month prior to the City's notification of its decision, Norquest and RCA decided to revise the drainage plans, which had been approved in March 1989. Upon review, SED noted defects in the revised plans, including the lack of an engineer's seal and inadequate drainage lines. SED did not approve the plans until December 3, 1989.

On May 24, 1991, an assistant city attorney representing DCLU discovered that Norquest had submitted revised drainage plans to SED at the same time that DCLU had been reconsidering the master plan issue. DCLU's attorney also learned that the revised plans had been corrected twice and had not been approved by SED until 12 days after Judge Schapira's order to issue the building permit. The attorney obtained this evidence from Alan Bennett, the plans reviewer for SED.

DCLU's attorney immediately telephoned the Partnership's attorneys and notified them that the City intended to call Bennett as a witness. The disclosure of witnesses deadline had passed by 25 days, and 3 weeks remained until the discovery cutoff deadline. The City nevertheless filed and served Bennett's affidavit and a supplemental witness list the next court day. The City planned to call Bennett to testify on the damages issue. In particular, Bennett was to testify that because the drainage plan did not receive final approval until December 1989, the City's August 1989 refusal to issue the permit could not have stopped the Partnership's project. The City contended that it was unaware that the partnership had submitted revised plans to SED when it issued the building permit on December 10, 1989, in compliance with the court order.

The Partnership moved to strike Bennett as a witness on the grounds that he had been identified after the cutoff date and that the City was bound by a stipulation in November 1989, stating that the permit was ready to be issued. Judge DuBuque agreed and granted the motion to strike on June 10, 1991. In a subsequent motion to reconsider, however, Judge DuBuque stated that the City could present other evidence on the issue of proximate cause to show that the permit was not ready to be issued as of the date of Judge Schapira's oral writ decision.

In July 1991, the case proceeded to trial before Judge Heavey on the Partnership's claim for delay damages based on RCW 64.40 and 42 U.S.C. § 1983, as well as for the torts of wrongful interference with business relations and mis-

representation. Finding that the prior rulings by Judges Schapira and DuBuque were the "law of the case", Judge Heavey held that the City was liable under all of the Partnership's claims except misrepresentation.

Judge Heavey later awarded the Partnership attorney fees in the amount of $67,720, and Judge Schapira awarded the Partnership attorney fees for $46,328.40 and costs of $406.40. The parties appeal.

We initially consider whether the orders of Judges Schapira and Heavey are properly before the court on appeal. Norquest first argues that because Judge Schapira's order of mandate was a final, appealable order, the City lost its right to appeal that order when it failed to file within the 30-day time limit prescribed by RAP 5.2. Norquest then argues that because the City is attempting to relitigate whether it was arbitrary and capricious (an issue decided by Judge Schapira) under a disguised appeal of Judge Heavey's damages award, the doctrine of collateral estoppel prohibits an appeal of Judge Heavey's order as well. We find Norquest's arguments unpersuasive.

First, in cases that present multiple claims for relief, RAP 2.2(d) provides that an appeal from a judgment not disposing of all claims is permissible only when the trial court has made an express certification, supported by written findings, that there is no just reason for delaying appeal. *See Fox v. Sunmaster Prods., Inc.*, 115 Wn.2d 498, 504, 798 P.2d 808 (1990). In the absence of the required findings, determination, and direction, a judgment that adjudicates less than all the claims is subject only to discretionary review. RAP 2.2(d).

Here, Norquest originally sought not only an order and judgment requiring issuance of the permit but also monetary damages under four separate theories. Judge Schapira, however, dealt only with the permit and left the issue of damages to be determined later. This case therefore raises multiple claims governed by RAP 2.2(d). In particular, because the damages claims remained and because the order was not certified pursuant to RAP 2.2(d), there was no final, appeal-

able order.[3] The City's appeal of Judge Schapira's order is therefore proper.

Second, if, as Norquest contends, the City had attempted to relitigate whether it was arbitrary and capricious before Judge Heavey, then the doctrine of collateral estoppel would apply. The record clearly establishes, however, that Judge Heavey accepted Judge Schapira's finding that the City was arbitrary and capricious as "the law of the case". Similarly, Judge Schapira's finding went unchallenged at trial by the City. What the City did challenge at trial was whether Norquest must *also* prove scienter in order to prevail on its wrongful interference with a business relationship claim and its 42 U.S.C. § 1983 constitutional substantive due process claim. Specifically, the City contended that Norquest must prove that the City's refusal to issue the permit was wrongfully motivated in addition to being arbitrary and capricious. This is a separate and distinct issue. We therefore find that, for these reasons, both orders are properly before the court on appeal.

---

[3]Compare *Lutheran Day Care v. Snohomish Cy.*, 119 Wn.2d 91, 829 P.2d 746 (1992), *cert. denied*, 113 S. Ct. 1044 (1993). In *Lutheran Day Care*, the trial court held on a writ of certiorari that the County's refusal to issue a daycare permit was arbitrary and capricious. The County did not appeal this holding and the permit was issued. *Lutheran Day Care*, at 97. Later, the County moved for summary judgment, arguing that the first trial court finding had not been necessary and that the County had not been arbitrary and capricious for purposes of liability for damages under RCW 64.40. *Lutheran Day Care*, at 98, 114. The trial court agreed and granted summary judgment in favor of the County. *Lutheran Day Care*, at 98. The Supreme Court reversed, holding that the doctrine of collateral estoppel prevented the County from relitigating under the summary judgment motion whether its conduct had been arbitrary and capricious. *Lutheran Day Care*, at 116.

Thus, in *Lutheran Day Care*, whether the County was arbitrary and capricious was decided at the trial court level in a final action. That case did not involve multiple claims because the issue of liability for damages could not be decided in a certiorari action. *Lutheran Day Care*, at 116. The present case differs in that RCW 7.16.260 authorizes a successful plaintiff in a mandamus proceeding to recover damages based on recognized and established causes of action. *Miller v. Pacific Cy.*, 91 Wn.2d 744, 749, 592 P.2d 639 (1979) (Rosellini, J., concurring); *Hillis Homes, Inc. v. Snohomish Cy.*, 32 Wn. App. 279, 282-83, 647 P.2d 43, *review denied*, 98 Wn.2d 1011 (1982).

 We next determine whether DCLU arbitrarily and capriciously denied the Partnership's request for a building permit. In deciding this issue, we must independently review the administrative record. *Citizens for a Safe Neighborhood v. Seattle*, 67 Wn. App. 436, 439, 836 P.2d 235 (1992) (citing *Grader v. Lynnwood*, 45 Wn. App. 876, 880, 728 P.2d 1057 (1986)), *review denied*, 120 Wn.2d 1020 (1993). A reviewing court will overturn a governmental decision only if it is arbitrary, capricious, or contrary to law. *Washington Waste Sys., Inc. v. Clark Cy.*, 115 Wn.2d 74, 80, 794 P.2d 508 (1990) (citing *Backlund v. Board of Comm'rs of King Cy. Hosp. Dist. 2*, 106 Wn.2d 632, 647-48, 724 P.2d 981 (1986), *appeal dismissed*, 481 U.S. 1034 (1987)). A governmental decision is arbitrary and capricious if it is willful and unreasoning action in disregard of facts and circumstances. *Washington Waste Sys.*, at 81 (citing *State v. Ford*, 110 Wn.2d 827, 830, 755 P.2d 806 (1988); *Abbenhaus v. Yakima*, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978)). Under this standard, a reviewing court does not make an independent assessment, but determines whether the evidence presented adequately supports the action of the governmental body. *Abbenhaus*, at 859.

The City argues that Judge Schapira impermissibly substituted her judgment for that of DCLU in finding its decision arbitrary and capricious. Specifically, the City asserts that all the facts DCLU considered in making its decision pointed to a close operational involvement by Northwest Hospital and the Partnership. Thus, the City contends that DCLU therefore properly denied the building permit on the basis that the treatment facility was an expansion of Northwest Hospital. We disagree.

An independent review of the record reveals that DCLU arbitrarily and capriciously denied the Partnership's request for a building permit. The four pieces of evidence considered by DCLU in denying the permit do not support its action. In particular, to constitute an expansion, the evidence considered by DCLU must have indicated more than "some" relationship. The purpose of the major institutions ordinance is

to prevent a major institution from *expanding* its operations.[4] Here, even when all of the evidence is considered together, there is no indication that Northwest Hospital was, in fact, expanding its operations.

First, as to the Partnership agreement, the City states that the project it had originally approved changed fundamentally once Norquest and RCA became partners. It argues that the agreement changed Norquest from a lessor to a partner in a joint venture formed to (1) develop and operate the proposed treatment center and (2) share in its proceeds. Consequently, in its reconsideration, DCLU interpreted the Partnership agreement as a business venture intended to advance Northwest's medical business in the Northwest Hospital neighborhood.

If the City's characterization of the agreement were accurate, then it might support a finding that the facility was an expansion of Northwest Hospital. The Partnership agreement on its face, however, did not fundamentally alter the original relationship established between Norquest and RCA. In particular, the City mischaracterizes the agreement by confusing the ownership of the site with the operation of the treatment center.[5] The stated purpose of the Partnership is to "acquire, develop, construct, lease and operate for investment a *building* on the *Property* . . .". (Italics ours.) Thus, the scope of the Partnership is limited to the building itself and does not affect the operation of the treatment facility. To the contrary, it is consistently undisputed that RCA is the sole operator of the treatment facility.

---

[4]As stated previously, the major institutions ordinance does not list any factors for DCLU to consider in determining whether an institution is "expanding" its operations. In its brief, the City indicates that a close operational and corporate relationship will likely render an organization an affiliate of a named institution. As the City initially recognized, however, a simple affiliate relationship is not enough. The applicability of the ordinance specifically turns on whether a major institution is expanding its operations.

[5]In a letter dated July 10, 1989, which was prior to DCLU's final decision, counsel for the Partnership explained the substance and effect of the Partnership agreement to DCLU.

The City nevertheless argues that by designating Norquest as the managing partner, the agreement gives control over the facility to Norquest. Again, however, the agreement states that as the managing partner, Norquest shall "implement all decisions of the Partnership with respect to the *Property* and to conduct the business and affairs of the *Partnership*." The "property" refers only to the "building", not to the operation of the treatment facility. Designating Norquest as the managing partner in the agreement simply maintained its status as "landlord" of the property, but it did not give Norquest control over the facility. Indeed, prior to the agreement, Norquest was to be the sole owner and landlord of the Bitter Lake site. Subsequent to the agreement, Norquest's ownership interest actually decreased from 100 percent to 70 percent.[6]

As to the profit sharing provision, the agreement provides that the partners will divide the profits and losses of the *Partnership*. Again, the scope of the Partnership is limited to the property itself, not to the operation of the facility. The agreement, therefore, does not entitle Norquest to any facility profits.

Thus, the Partnership agreement did not fundamentally alter the relationship between Norquest and RCA. The agreement specifically provided that the scope of the Partnership was limited to the property and that RCA retained exclusive control over the profits and operation of the facility. DCLU could therefore not rely on the Partnership agreement to support a finding that the treatment facility constituted an expansion of Northwest Hospital.

---

[6]The City so stipulated before Judge Schapira:

"On June 6, 1988, Norquest and RCA-W executed their partnership agreement. . . . Norquest then assigned its interest in the Purchase and Sale Agreement to Norquest/RCA-W. The effect of this assignment was to change the proposed arrangement from one in which Norquest would be the landlord and RCA-W the tenant to an arrangement in which Norquest/RCA-W would be the landlord. . . . *The only effect of the change was to reduce Norquest's equity ownership interest in the property from 100% to 70%.*" (Italics ours.) Brief of Respondent, at 17.

As to the second piece of evidence relied on by DCLU, the check written by Northwest Hospital, the City stipulated before Judge Schapira that the check was "issued in error". The City also stipulated to the fact that RCA reimbursed Norquest for the permit fee and that all other permit fees were paid exclusively by RCA's architect and attorneys. Thus, the stipulated facts do not support an inference that Northwest Hospital, as a result of the issuance of the check, expanded or was expanding its operation.

As to the third piece of evidence relied on by DCLU, the Yellow Pages advertisement, the City correctly states that the name "New Beginnings of Northwest" certainly gives "the inference that the drug treatment center was trading upon the name of Northwest Hospital." This fact alone, however, is insufficient to show an expansion of the hospital's operations. As RCA explained to DCLU during its reconsideration, the name "New Beginnings" could not be used because a women's shelter in Seattle already had that name. RCA therefore chose the name to refer to the geographical Northwest, as did several other businesses advertised on the same page. Thus, as with the erroneously issued check, there is no showing whatsoever that the hospital's operations were being expanded.

Finally, as to the interlocking directors and officers, Brent Carson initiated the preapplication conference with DCLU where he described the corporate relationship between Norquest, PCSC, Health Resources, and Northwest Hospital. In fact, Carson raised the issue of whether the master plan process would apply, and to assist DCLU in understanding the various corporate relationships, Carson provided DCLU with a rough organizational chart.

The City nevertheless suggests that Carson knowingly failed to disclose the presence of the interlocking officers. The City claims that it would have come to a different decision had it been provided with this piece of information. The record makes clear, however, that during the preapplication process, Carson communicated his concern over the applicability of the master plan process, provided DCLU with all of

the information that it requested, and was willing to respond to any additional questions. The record likewise makes clear that, despite the interlocking officers, all of the above corporations remained independent of one another. We therefore find that the overlap of officers and directors did not support a finding that Northwest Hospital was expanding its operations.

Thus, in summary, while it may be true that PCSC was expanding the nature of its business, the focus of this case is on the major institutions ordinance. Under this ordinance, the issue is whether Northwest Hospital, and not a subsidiary of Northwest Hospital's parent company, had expanded its operation. In our review of the record, we are unable to find one scintilla of evidence to suggest that Northwest Hospital had expanded its operation to include drug treatment. Significantly, in light of the fact that DCLU had already stated 2 years earlier that the master plan process would not apply, it was critical that DCLU rely on evidence sufficient to support a reversal of its prior position. Here, the evidence relied on by DCLU in denying the permit did not support its decision. We therefore hold that DCLU arbitrarily and capriciously denied the Partnership's request for a building permit.

In the alternative, the City argues that even if Judge Schapira properly exercised her judgment, her findings and conclusions are nevertheless legally insufficient to satisfy what it claims to be the newly established standard of review for evaluating arbitrary and capricious conduct. Specifically, according to the City, the Washington Supreme Court held in *Lutheran Day Care v. Snohomish Cy.*, 119 Wn.2d 91, 829 P.2d 746 (1992), *cert. denied*, 113 S. Ct. 1044 (1993), that arbitrary and capricious conduct automatically subjects the government to damages under 42 U.S.C. § 1983 for a violation of the federal constitution. *Lutheran Day Care*, at 124-25. The City therefore contends that by equating arbitrary and capricious conduct with a violation of the federally protected right of substantive due process, the Washington Supreme Court tied the state law standard to the federal standard. The federal

standard, in turn, provides that a violation of substantive due process requires either a substantial violation of state law caused by animus or a " 'deliberate flouting of the law that trammels significant personal or property rights' ". *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 23, 829 P.2d 765 (quoting *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir.), *cert. denied*, 488 U.S. 956 (1988)), *cert. denied*, 113 S. Ct. 676 (1992). The City thus contends that, in light of *Lutheran Day Care*, a finding of arbitrary and capricious governmental conduct now requires animus or a deliberate flouting of the law. Here, there was no such finding.

We agree with the City to the extent that, under *Lutheran Day Care*, an arbitrary and capricious denial of a building or conditional use permit automatically entitles one to section 1983 damages. Our reading of *Lutheran Day Care* indicates, however, that the Supreme Court did not modify or replace the traditional arbitrary and capricious standard. Rather, the court in *Lutheran Day Care* appears to have established that a finding of arbitrary and capricious governmental conduct under the traditional standard is sufficient, by itself, to violate substantive due process.

Specifically, in *Lutheran Day Care*, the County denied Lutheran Day Care's application for a conditional use permit. Lutheran Day Care subsequently brought a writ of certiorari action and damages claims. The trial court held that the County's denial of the permit was arbitrary and capricious given that there was "no factual basis for the hearing examiner's conclusions[.]" *Lutheran Day Care*, at 97. Then, despite ordering the permit to issue, the trial court dismissed Lutheran Day Care's damages claims under 42 U.S.C. § 1983 because it had failed to allege purposeful discrimination or reckless or knowing misdeeds. *Lutheran Day Care*, at 98. The Washington Supreme Court reversed, stating:

"Along with the vast majority of federal courts, we recognize that denial of a building permit, under certain circumstances, may give rise to a substantive due process claim." We see no reason to treat denial of a conditional use permit any differently. Such denial therefore can constitute a due process violation. Such a violation is made out, however, only if the decision

to deny the permit is "invidious or irrational" or "arbitrary or capricious". In the present case, the trial court can be interpreted as denying appellant's due process claim based on the fact that the County did not act knowingly or recklessly in denying the permit. *This is the wrong standard. The standard is arbitrary or capricious and . . . Judge Kershner's finding in the certiorari action that the County acted arbitrarily and capriciously in denying the permit conclusively satisfies that standard. Appellant therefore has established as a matter of law and fact that the County violated substantive due process when it denied the conditional use permit.*

(Footnote omitted. Italics ours.) *Lutheran Day Care*, at 125 (quoting *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 412, 780 P.2d 838 (1989)).

In this passage, the court clearly states that an arbitrary and capricious denial of a building or conditional use permit violates substantive due process and entitles one to section 1983 damages. There is no indication, however, that the court intended to modify the traditional arbitrary and capricious standard applied by Washington courts. Indeed, if the court had intended to modify the standard in *Lutheran Day Care*, then it would have likely ordered a limited remand to determine whether the facts satisfied the new standard.

Arguably, this reading of *Lutheran Day Care* is difficult to reconcile with *Sintra*, a case decided on the same day. In *Sintra* the court stated:

In discussing the availability of § 1983, we have said that "a land use decision 'denies substantive due process only if it is invidious or irrational.' " Other courts have expressed the test differently, but conveyed essentially the same test. Relief is said to be available for § 1983 claims involving substantive due process only where there is a substantial infringement of state law prompted by animus directed at an individual or a group, or a "deliberate flouting of the law that trammels significant personal or property rights". Arbitrary, irrational action on the part of regulators is sufficient to sustain a substantive due process claim under § 1983.

(Citations omitted.) *Sintra*, at 23. The court's language initially suggests that some animus or flouting is required to establish a section 1983 substantive due process violation. It then goes on to say, however, that "arbitrary, irrational action" is sufficient.

Thus, in light of *Sintra*, there is certainly some genuine confusion over what role a finding of arbitrary and capricious conduct, under the traditional standard, plays in establishing a section 1983 substantive due process violation. Any clarification, however, must come from our Supreme Court. Therefore, despite the City's argument as to what the appropriate standard should be, we find that the holding in *Lutheran Day Care* is clear. We are thus compelled to find that there was no increased burden on Judge Schapira to make findings and conclusions under a modified arbitrary and capricious standard.[7]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

WEBSTER, C.J., and FORREST, J. Pro Tem., concur.

Reconsideration denied February 8, 1994.

Review denied at 124 Wn.2d 1021 (1994).

---

[7]Significantly, even if something more is required for a section 1983 substantive due process violation, the outcome of this case would remain unaffected. In particular, RCW 64.40 permits damages for arbitrary and capricious conduct. In determining damages under this section, Washington courts have long employed the traditional arbitrary and capricious standard.